**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 22, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ALBERT HINDS,

      Plaintiff - Appellant,

v.

SPRINT/UNITED MANAGEMENT
COMPANY and SPRINT
CORPORATION,

      Defendants - Appellees.

No. 07-3027

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 05-CV-2362-KHV)**

---

Dennis E. Egan of The Popham Law Firm, P.C., Kansas City, Missouri, for
Plaintiff-Appellant.

Joseph H. Knittig (Paul D. Seyferth with him on the brief) of Seyferth Knittig &
Blumenthal, LLC, Kansas City, Missouri, for Defendants-Appellees.

---

Before **McCONNELL, BALDOCK,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

      Sprint/United Management Company and Sprint Corporation (collectively,

"Sprint") discharged Albert Hinds as part of a reduction in force in which his

entire department was eliminated. Mr. Hinds sued, alleging that Sprint discriminated against him on the basis of age and retaliated against him for complaining of age discrimination. The district court granted summary judgment for Sprint on both counts. Because Mr. Hinds does not present evidence from which a reasonable juror could discredit Sprint's age-neutral explanation for his discharge or conclude that a retaliatory motive spurred his termination, we affirm.

I

While this case centers on Mr. Hinds's discharge in 2004, in his view that event represents only the culmination of a series of events suggestive of age discrimination and unlawful retaliation; accordingly, we begin at the beginning of Mr. Hinds's relationship with Sprint.

A

Mr. Hinds joined the company as a senior supervisor at its Overland Park, Kansas headquarters in October 1994, when he was 40 years old. During the 1990s, Sprint promoted Mr. Hinds at least twice, and he received generally positive performance reviews, a pattern that continued into the early part of the next decade. So, in October 2001, Mr. Hinds accepted a position as a project manager on Sprint's newly-created Workforce Management Team ("WFM"), a position with a Sprint pay grade of 77, and, several months later, in May 2002, Sprint promoted Mr. Hinds to a project manager position with a higher pay grade

of 78. As a project manager in the WFM group, Mr. Hinds bore responsibility for the operation of several Sprint call centers.[1]

Sometime after this latest promotion, things began to change for Mr. Hinds. Ted Smith, Mr. Hinds's immediate supervisor in the WFM group, became concerned that, while very competent technically, Mr. Hinds had developed certain communication problems in dealing with his peers, customers, and supervisors. Mr. Smith also believed Mr. Hinds was not adapting to the process of negotiating with the call centers for which he was responsible. In mid-2002, Mr. Smith provided Mr. Hinds with a performance evaluation that reflected these concerns, giving Mr. Hinds the next-to-lowest performance rating in ten different areas of assessment. In response, Mr. Hinds acknowledged he had communication challenges with his peers and supervisor.

A few months later, David Roberson, who also worked in the WFM group, replaced Mr. Smith as Mr. Hinds's supervisor. Mr. Roberson had been hired into the WFM group at its inception as a level 78 employee, a level above Mr. Hinds at the time, but a level below his own prior job elsewhere in Sprint. At the time he replaced Mr. Smith, Mr. Roberson was 42 years old, compared to Mr. Hinds's

---

[1] Neither party describes the exact functions and operations of the Sprint call centers, so it is not clear, for example, whether the call centers had contact with Sprint customers or whether other departments within Sprint were the "customers" served by the call centers. *See* Aplt. App. at 484.

48, though he had worked for Sprint a year longer than Mr. Hinds. Shortly after his promotion within WFM, Mr. Roberson and Krystal Barr, the director with responsibility for WFM, began receiving complaints from several of Mr. Hinds's peers and clients that he did not listen to them or accept their input and feedback, and that he sent criticisms directly to senior level management without first trying to work with his peers and follow Sprint's chain of authority. Jim Curran, a Sprint vice president to whom Mr. Hinds would directly bring low-level problems, told Ms. Barr to make sure Mr. Hinds shared his ideas and criticism with his peers first and worked through issues with them constructively as a team when possible. Although Ms. Barr communicated this to Mr. Hinds, apparently he did not comply, explaining that he simply had a different "management paradigm" than his supervisors and that, as long as he met objective goals, how well he got along with peers, management, and clients should not matter. Aplt. App. at 158, 214; *see* D. Ct. Order 12/12/06 at 8.

B

In May 2003, Mr. Hinds wrote an e-mail to Rich Joyce in human resources complaining about Mr. Roberson's appointment to the WFM supervisory position, and noting that he had more WFM experience than Mr. Roberson, as well as an advanced business degree. In June 2003, Mr. Hinds followed up by meeting

personally with Mr. Joyce and asking Mr. Joyce, among other things, "could this have been age discrimination?" Aplt. App. at 136.

The next day, Mr. Hinds sent an e-mail to Sprint's CEO, Gary Forsee, complaining about Sprint internal politics, the new performance evaluation rating system, and the company's management philosophy in general. He referred to his age in the following context: "I am significantly older than many of [my managers], have more business experience and more education. I refuse to align with a business decision that I know is wrong, based on my experience and knowledge." Aplt. App. at 173. Mr. Hinds later testified at his deposition that the purpose of this message was *not* to complain of age discrimination but to make Mr. Forsee aware of "the challenges that [he] had and that others were having with [aspects of the company's then newly instituted performance evaluation rating] system." Aplt. App. at 133-34. As part of the new rating system, employees were assigned an overall rating in addition to ratings in particular categories, as had previously been the case.[2] Many employees, including Mr. Hinds, apparently were not pleased with the new performance evaluation system.

---

[2] The overall rating system consisted of the following: M (most effective); H (highly effective); V (very effective); L (less effective); and N (not yet rated).

In September 2003, Mr. Roberson prepared a scheduled performance evaluation for Mr. Hinds in which he rated Mr. Hinds below average in several categories and assigned him an overall rating of "less effective," the lowest possible rating. Mr. Roberson described Mr. Hinds as "high maintenance," requiring considerable high-level management and human resources time and attention on issues Mr. Hinds was expected to handle with his call centers and peers without such assistance. Aplt. App. at 328.

C

Toward the end of 2003, Sprint underwent a company-wide reorganization in which some employees in WFM faced discharge as part of a reduction in force ("RIF"). At the same time, Sprint created a new group dedicated to long-term strategic planning and forecasting called the Call Center Tools and Technology Evolution ("CCTTE") group. Marian Fields was the CCTTE manager and Joe Modica was the director responsible for the group. Ms. Barr recommended Mr. Hinds to Mr. Modica because she believed a strategic planning position would suit his technical strengths and play away from his perceived interpersonal skill weaknesses. Mr. Hinds accepted the position in CCTTE, a pay grade 77 position, one pay grade below his prior WFM post. Four other employees also joined CCTTE, all at pay grade 77; three were older and one younger than Mr. Hinds.

Around this same time in November 2003, Mr. Hinds sent another e-mail to Mr. Joyce in human relations. This time, Mr. Hinds asserted that his complaints about Sprint management, including the promotion of Mr. Roberson, had "put them in the position to have retaliatory inclinations." Aplt. App. at 643. He said he saw "a clear path of retaliatory action" by Smith, Roberson, Curran, and Barr due to the "negative feedback" he had provided on their performance evaluations. *Id.* Mr. Hinds alleges he also sent a PowerPoint presentation to several of his managers and human resources representatives. The presentation generally complained about the company's new performance evaluation rating system, but one of the ten slides did state that Mr. Hinds believed Mr. Roberson gave him a low rating "in retaliation for taking issues to HR and upper management or as an act of discrimination." *Id.* at 359. The slide went on to state that Mr. Hinds also believed he was "downgraded a band level and moved out of WFM vs. being promoted to the WFM senior manager position [as] an act of retaliation." *Id.*

In January 2004, Mr. Hinds again e-mailed Mr. Joyce in human relations, this time with a copy to Mr. Forsee and James Kissinger, the head of human relations for the entire company. In this e-mail, Mr. Hinds complained about Mr. Roberson's performance review deeming him "high maintenance" for consuming high-level management and human resources time. In response, Mr. Kissinger wrote Mr. Joyce to say he remembered "frequent escalated e-mails from [Mr.

Hinds] over the years – some legit, some not – in almost every role he has held."

Aplt. App. at 640. He went on to say, "I would guess that going to HR is not the issue in this case – but skipping multiple levels in the chain of command is not uncommon for him – and not necessarily appropriate." *Id.* In a follow-up e-mail to Mr. Joyce, Mr. Kissinger relayed a similar experience with another employee who had escalation problems, was put on warning, and was ultimately fired.


D

In May 2004, Sprint undertook another reorganization and RIF. This time, the CCTTE group was eliminated. In connection with the RIF, various managers, including Mr. Modica, held a full-day meeting to determine, among other things, whether alternative employment opportunities within Sprint existed for the CCTTE employees. In this vein, Mr. Hinds was considered for an open position in another group, but the job was ultimately given to a different CCTTE employee, Mark Smith. Mr. Smith had 30 years of experience with Sprint and was 54 years old; at the time, Mr. Hinds was 49 and had approximately 10 years with the company. In addition to Mr. Smith, two other CCTTE employees and the CCTTE manager, Ms. Fields, secured other open positions within Sprint; all three were also older than Mr. Hinds. Ultimately, only Mr. Hinds and another CCTTE employee, the youngest member of that group, were discharged.

After the meeting, spreadsheets were prepared identifying the employees in the various groups, including CCTTE, impacted by the reorganization and RIF. Uncontested testimony suggests that these spreadsheets were completed to allow Sprint's human resources department to review, after the fact, the potentially-impacted candidates and check for any "potential problems" with the decisions that were made in the meeting. Aple. Supp. App. at 83. Affected employees were divided into different spreadsheets based on their individual skills sets; Mr. Hinds was listed in the "infrastructure support" spreadsheet. This spreadsheet provided performance rating histories, years in service, and manager evaluations for each listed employee. It also included certain "hidden" data cells that contained various personal information such as the employee's age, ethnicity, military status, and disability, if any; these data cells were password protected, and the information in them apparently was not available to decisionmakers at the time of Mr. Hinds's discharge, though the security of this information is open to some question. *See infra* note 10.

E

In February 2005, Mr. Hinds filed a discrimination complaint against Sprint with the Equal Employment Opportunity Commission. After receiving notice of his right to sue from the Commission, Mr. Hinds filed this lawsuit against Sprint, alleging that the company violated the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 621 *et seq.*, in two ways:  (1) discriminating against him because of his age; and (2) retaliating against him for his complaints of age discrimination.[3]

Before the district court, Mr. Hinds initially proceeded with his age discrimination claim on the theory that Sprint treated younger employees *within* CCTTE more favorably than him during the May 2004 RIF.  It soon became apparent in the discovery process, however, that Sprint actually retained the oldest members of the CCTTE group and discharged only the two youngest, and Sprint moved for summary judgment on this basis.  Mr. Hinds responded by seeking to revise his discrimination theory, now suggesting that age discrimination was apparent from Sprint's decision during the RIF to retain certain younger employees who were also listed in the "infrastructure support" spreadsheet and shared his pay grade at the time (77) but worked in positions *outside* the CCTTE group.  Although this new theory arguably went beyond the scope of the district court's pretrial order,[4] Sprint did not object to it and, in an

---

[3]  Because Mr. Hinds filed his administrative claim within 300 days of his termination, his claims in this suit are not time-barred, as Sprint argues, and this case is properly before us.  *See* 29 U.S.C. § 623(d)(2); *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1163 (10th Cir. 2007).

[4]  In the pretrial order, Mr. Hinds's claim was that Sprint treated "younger employees in [his] department" more favorably in the RIF by allowing them to retain their positions.  Aplt. App. at 29.  The order did not mention any claims regarding younger employees outside Mr. Hinds's department.

attempt to give Mr. Hinds every benefit of the doubt, the district court considered his new theory. Because Sprint had not been given an opportunity to address Mr. Hinds's new theory in its opening brief at summary judgment, however, the court ordered supplemental briefing and received additional evidence from both parties.

Sprint supported its supplemental brief with affidavits from two witnesses, David Wamsher and Kevin Quirk. The affidavits discussed the various non-CCTTE employees in Mr. Hinds's same pay grade who were retained by the company. Mr. Hinds filed a response brief and a motion to strike the affidavits or reopen discovery. The district court denied the motion and considered the affidavits in its summary judgment decision, ultimately granting summary judgment for Sprint on Mr. Hinds's age discrimination and retaliation claims.[5]

---

[5] Mr. Hinds argues that the district court should not have considered Sprint's supplemental summary judgment brief and the supporting affidavits from Mr. Wamsher and Mr. Quirk, or should have reopened discovery. The district court, however, did not abuse its discretion by considering the supplemental brief and evidence and declining to reopen discovery because (1) Mr. Hinds introduced his new discrimination theory comparing himself to employees outside the CCTTE group only after the close of discovery; (2) the district court allowed Mr. Hinds to submit a surreply brief and additional supporting evidence responding to Sprint's supplemental brief; and (3) Mr. Hinds had already deposed Mr. Wamsher and Mr. Quirk, and thus was not completely without an opportunity to question them about his expanded theory. *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998).

II

Mr. Hinds now seeks reversal of the district court's judgment. As always, we assess this summary judgment appeal *de novo*, viewing the facts, and all reasonable inferences those facts support, in the light most favorable to Mr. Hinds as the non-movant. *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1249 (10th Cir. 2006). Summary judgment is of course appropriate if, but only if, the evidence reveals no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

A

Turning first to Mr. Hinds's age discrimination claim, we begin with Congress's charge to us. Congress has indicated that an ADEA claim pursuable in federal court arises when certain employers "discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1); *id.* § 626(c)(1). Thus, pertinent for our current purpose, a plaintiff must prove that his or her discharge was motivated, at least in part, by age. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000).

Though Mr. Hinds concedes he lacks *direct* evidence of discriminatory intent, he still may carry his statutory burden by presenting *circumstantial* evidence in accord with the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04

(1973). Under *McDonnell Douglas*, the plaintiff first bears the burden of establishing a prima facie case of age discrimination. If the plaintiff carries this burden, the employer must then come forward with some legitimate, non-discriminatory reason for the adverse employment action. If the employer succeeds in this showing, the burden shifts back to the plaintiff to show that the employer's proffered justification is pretextual. *See Young*, 468 F.3d at 1249.

1

To make out a prima facie case of age discrimination, our case law requires a plaintiff affected by a RIF to show that he or she (i) was within a protected age group, (ii) was doing satisfactory work, (iii) was discharged despite the adequacy of his or her work, and (iv) has *some* evidence the employer intended to discriminate against him or her in reaching its RIF decision. *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998). The parties before us proceed on the basis that the fourth element may be satisfied by a showing that, during the RIF, the employer discharged the plaintiff but retained a younger employee who held a "similar position." *Id.* at 1167.

Sprint concedes that Mr. Hinds has established the first three elements of a prima facie case, but contests the fourth by pointing to the fact that the company did not retain any employees in the CCTTE group younger than Mr. Hinds. Once these facts became apparent to Mr. Hinds during the district court proceedings,

and without any objection by Sprint, Mr. Hinds changed tack and amended his discrimination theory by seeking to compare himself not only to employees inside the CCTTE group, but to employees outside the CCTTE group who shared his level 77 pay grade and whose groups were also assessed during the RIF. Using this measure, Mr. Hinds points to the fact that Sprint retained seven pay grade 77 employees younger than him.

Two aspects of Mr. Hinds's amended discrimination theory seem to us significant. First, it is important that, as here, the employer's RIF process affected not just the plaintiff's group but also the business units containing the younger employees who the plaintiff alleges occupy positions similar to his or hers. It is the fact that the employer scrutinized *both* departments during the RIF and decided to retain similarly situated younger employees while discharging an older employee that gives rise to an inference of discrimination. *See id.* ("[T]he employer could have retained [the older employee] but *chose instead* to retain a younger employee." (emphasis added)). Such an inference does not arise simply because an employer eliminates an entire underperforming business unit in a RIF, firing, say, accountants along with all others in that unit, but does not undertake a RIF process with respect to other business units, thus retaining otherwise similarly qualified accountants in those business units whose positions were not up for consideration in the RIF. *See, e.g.*, *Pippin v. Burlington Res. Oil & Gas*

*Co.*, 440 F.3d 1186, 1193 (10th Cir. 2006) (fourth element may be established through "evidence that the plaintiff was treated less favorably than younger employees *during the RIF*" (emphasis added) (quoting *Beaird*, 145 F.3d at 1165)); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1138 (10th Cir. 2000) (evidence that employer filled similar positions with younger employees "during the reorganization" satisfies fourth element); *Krause v. Dresser Indus., Inc.*, 910 F.2d 674, 677 (10th Cir. 1990) (fourth element satisfied when RIF leaves only one accounting position in department with two accountants and employer retains the younger accountant).

Second, the fact that employees in business units affected by a RIF simply share the same pay grade does not establish, standing alone, that the employees occupy "similar positions." After all, a security guard and a secretary, a doctor and a lawyer, may well share pay grades in a large corporation but cannot reasonably be said to hold "similar positions." And Mr. Wamsher and Mr. Quirk testified in their affidavits that this is exactly the case at Sprint: employees in the same pay grade at the company do not necessarily perform substantively comparable jobs. Accordingly, we hold that, at a minimum, a plaintiff must establish that a purportedly "similar position" is one that he or she was qualified to assume. The purpose of the ADEA is to address intentional discrimination between like persons on the basis of invidious criteria; the fact that a company

- 15 -

discharges security guards but not secretaries in the same pay grade does nothing to tell us whether discrimination, as opposed to legitimate business concerns, was at play. To give rise to an inference of unlawful discrimination, the plaintiff must come forward with evidence suggesting that the non-discharged employee occupied a position the plaintiff was qualified to assume.

In this case, Mr. Hinds has come forward with evidence that the business units employing the seven younger employees he has identified *were* affected by the RIF. Giving him the benefit of the doubt, and for purposes of this appeal, we also proceed on the assumption that Mr. Hinds was qualified to assume the spots held by the individuals outside the CCTTE group he has identified. Under these conditions, all four of *Beaird*'s elements are satisfied, and the burden shifts to Sprint to come forward with evidence suggesting a legitimate non-discriminatory reason for its decision to discharge Mr. Hinds.

2

Mr. Hinds simplifies this portion of our analysis by conceding that Sprint has carried its burden. Specifically, Mr. Hinds acknowledges Sprint's evidence that his position was eliminated only as part of a larger, non-discriminatory business decision to discontinue the entire CCTTE group. And he does not contest Sprint's evidence, from Mr. Modica, Mr. Wamsher, and Mr. Quirk, that, while Mr. Hinds's entire group was eliminated, the positions of the seven younger

non-CCTTE employees were not eliminated as part of the RIF. That is, although their groups were subjected to review as part of the RIF process, their groups, unlike the CCTTE group, were not totally eliminated and, indeed, their positions, along with others in their groups, were retained intact.

This, then, is not a case where the plaintiff and younger employees all had their positions eliminated and the company found alternative employment options only for younger employees. *Cf. Stone*, 210 F.3d at 1135-36. Neither is it a case where the company chose to eliminate only plaintiff's position, but retained other, younger employees in his or her business unit. *Cf. Beaird*, 145 F.3d at 1168. Quite unlike these scenarios, the one now before us appears far more obviously consonant with legitimate business practices and concerns – *viz.*, a company discontinuing a business unit it has determined to be unproductive, while retaining other employees in other productive business units in their preexisting jobs. Indeed, Sprint employees testified uniformly that it is their company's policy to keep in their current positions those employees whose positions are not eliminated in a RIF and to terminate only those employees whose positions are eliminated if they cannot be placed in open positions elsewhere in the company. *See* Aplt. App. at 343, 713, and 721.

To reach trial, it remains for Mr. Hinds to demonstrate that a genuine issue of material fact exists on the question whether Sprint's purported justification for his termination was pretextual. To accomplish this task, Mr. Hinds must present facts suggesting that Sprint's proffered age-neutral reason for his dismissal is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reason[] [is] unworthy of belief." *Young*, 468 F.3d at 1250. In the typical RIF case, a plaintiff demonstrates pretext by presenting evidence that his or her termination did not accord with the company's RIF criteria, that the RIF criteria were deliberately falsified or manipulated to secure the plaintiff's dismissal, or that the RIF generally was pretextual. *Pippin*, 440 F.3d at 1193.

Before us, Mr. Hinds does not dispute that Sprint eliminated his position in the CCTTE group – indeed eliminated the entire CCTTE group – as part of the RIF; that the RIF did not eliminate the positions of the seven younger non-CCTTE employees he has identified; or that Sprint's policy was to retain in their preexisting jobs employees whose positions were not affected by the RIF.

Instead, Mr. Hinds claims that pretext can be discerned from a single document – the spreadsheet created after the meeting of Sprint managers regarding the RIF. *See supra* Part I.D. Specifically, Mr. Hinds identifies three features associated with the spreadsheet that he believes to be "key evidence" of

pretext: (i) while Sprint claims that it used the spreadsheet only *after* termination decisions, instructions accompanying the document suggest it was to be used *during* the decisionmaking process; (ii) the spreadsheet contains certain "subjective" evaluations by managers and age data about the employees; and (iii) the spreadsheet does not include some members of the CCTTE group Sprint retained in other positions, even though their original positions were also eliminated in the RIF. We address each of these points in turn.[6]

(i)

Regarding the first, Mr. Hinds calls our attention to generic instructions accompanying Sprint's "Selection Worksheet Job Aid for Managers" that describe the spreadsheet as a "tool" for managers to use in identifying "potential candidates for displacement/selection for job opportunities." Aplt. App. at 636. In this particular case, of course, Sprint managers uniformly testified that they did not actually use the spreadsheet in making their termination decisions, and that

---

[6] Mr. Hinds also lists additional "unanswered questions" related to the spreadsheet that he asserts contribute to raising a genuine issue of material fact as to Sprint's true motivation for firing him. Some of these echo issues raised in his "key evidence" arguments. The others, however, are but questions, and Mr. Hinds does not, as he must, present evidence of potential answers suggesting pretext. "To avoid summary judgment, a party must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any material fact claimed to be disputed. Thus, plaintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is [] insufficient." *Branson v. Price River Coal Co.*, 853 F.2d 768, 771-72 (10th Cir. 1988) (quotation omitted).

the document was instead completed after the fact by the human resources department as part of a process to see if there were any "potential problems" (including, it seems, questions of discrimination) associated with decisions the relevant managers had already made. *See supra* Part I.D.[7] Mr. Hinds argues that this "contradiction" between the instructions in the spreadsheet tool and Sprint's alleged use of the spreadsheet in this case is enough to raise a genuine issue of material fact on the issue of pretext for two reasons.

First, Mr. Hinds can be understood to suggest that if, as the Sprint managers testified, they did complete the spreadsheet only after the firing decisions, they did so in contravention of the spreadsheet instructions and we may infer pretext from this "contradiction" alone. In response, Sprint does not dispute the existence of its generic instructions accompanying the spreadsheet, but argues only that they were not followed in this particular case. And, standing alone, it is hardly suggestive of discriminatory animus (and thus capable of satisfying the

---

[7] For example, Mr. Wamsher, a Sprint human resources manager, explained that human resources asked the managers to fill out the evaluation section of the spreadsheet after the selection meeting "to determine if there [were] any issues, potential problems, with regards to the data and those that were selected or not selected. It gave us as an HR function an opportunity to do a once-over to make sure we were comfortable with the decisions that were made." Aplt. App. at 582. Mr. Quirk, a Sprint manager tasked with gathering evaluations about employees from managers for the spreadsheet, testified that he did not read the instructions to the spreadsheet but simply filled in the employee evaluation cells requested by human resources.

pretext requirement) that, in a particular case, a company used a human resources "tool" to evaluate employees at a time, or in a manner, other than that directed by its generic instructions. As we have repeatedly explained, we simply do not sit as a "super personnel department" to enforce an employer's policies about the manner in which its internal human resources tools are deployed. *Young*, 468 F.3d at 1250; *see, e.g.*, *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007) (employer's failure to follow company policies of seeking employee's response to customer complaint against her and having station manager personally inform employee of termination did not suggest pretext for unlawful discrimination).

Now, to be sure, if Mr. Hinds had *some* evidence that Sprint failed to follow its policies in this particular case for a discriminatory reason, that would be a very different matter. But the mere failure of a company's employees to follow their employer's manuals and written directives, without more, does nothing to suggest discrimination as opposed to perhaps, say, laxity on the part of company employees. If the case were otherwise, potentially every irregularity or deviation from company policy during a RIF would suffice to show pretext, even when there is no evidence that the action was taken in anything but good faith, much less as a subterfuge for pursuing a discriminatory purpose. Indeed, it would appear that Sprint used the spreadsheet at issue here, if anything, as a tool to

scrutinize hiring and firing decisions (albeit after the fact) for signs of potential problems such as discrimination, and inferring discriminatory animus under these circumstances would, if anything, risk undermining, rather than furthering, the ADEA's purposes. *See* 29 U.S.C. § 621(b); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999) ("Dissuading employers from implementing programs or policies to prevent discrimination in the workplace is directly contrary to the purposes underlying [the ADEA].").

Second, in the face of all this, Mr. Hinds seems to suggest an alternative course exists to infer pretext from the spreadsheet's generic instructions. Noting that there is a dispute of fact between the generic instructions accompanying Sprint's spreadsheet and the testimony of its employees about its use, and viewing the facts in the light most favorable to the plaintiff, Mr. Hinds suggests that we must infer the spreadsheet *was* created before termination decisions were made and *was* used by managers during the decisionmaking process. We readily concede this possibility. Although, as we have already indicated, there is no inherent contradiction between the generic instructions and Sprint's testimony that its managers did not use the spreadsheet in making their termination decisions, a reasonable juror could consider the instructions to be evidence suggesting that the Sprint managers, in contradiction to their testimony, did in fact complete the spreadsheet before termination decisions were made. But, even

if we were to suppose that Sprint *did* use the spreadsheet during the decisionmaking process, we must still ask: What exactly in the spreadsheet or its use as part of the decisionmaking suggests discriminatory animus? This question takes us to Mr. Hinds's second point.

(ii)

Mr. Hinds asserts that pretext can be inferred from the spreadsheet and its purported use in the decisionmaking process because the document contained "subjective" performance evaluations by his manager and hidden cells listing the employees' ages.

With respect to the performance evaluations, Mr. Hinds points to our precedent indicating that "subjective evaluation methods" with no explanation or supporting basis may sometimes be viewed with "skepticism" and, under certain circumstances, can be "susceptib[le] to discriminatory abuse." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002). We hold, however, that the evaluations at issue here differ in kind from those at issue in *Garrett* and give rise to no such concern. There, the evaluated employees were simply ranked from best to worst, and the record was devoid of any evidence showing how their order was determined. Here, by contrast, the spreadsheet set out common, objective criteria on which the relevant manager independently rated each

employee.[8]  It also provided room for comments by the manager to support the numerical ratings assigned.[9]  Quite unlike the evaluation system at issue in *Garrett*, the opaqueness of which made it susceptible to unspoken discriminatory input, the evaluation system here was transparent and reflected that all listed employees were evaluated according to the same criteria, based on the same scale, and assessed in non-discriminatory terms.

With respect to the information about employees' ages, none of this appears on the face of the spreadsheet; instead, it is contained in password-protected cells hidden from unauthorized viewers.  The uncontested evidence in this case is that a

---

[8]  Each employee was evaluated according to four "job requirements" and five "behavioral dimensions."  The job requirements were as follows: "Understanding of technology and associated capabilities, Problem solver / Analytical / Implementation / Ideation, Ability to understand business process and needs along with strategy, and Experience working on systems projects with ITS / vendors."  Aplt. App. at 629.  The six behavioral dimensions were "Act with Integrity, Focus on the Customer, Deliver Results, Build Relationships, and Demonstrate Leadership."  *Id.*  Each employee's manager provided evaluative comments in every category as well as a numerical rating, which was based on a scale from one to five, one being "greatly exceeds expectations," three being "fully meets expectations," and five being "unacceptable."  *Id.*  Mr. Hinds received twos and threes on his job requirements and threes and fours on his behavioral dimensions.

[9]  For example, Mr. Hinds's manager gave him a two rating for "Understanding of technology and associated capabilities," explaining that "Al understands the Workforce Management SBS requirements and provides the expertise to other SBS, SCS and IBM representatives."  Aplt. App. at 629.  She explained his four rating in "Focus on the Customer" by commenting, "Al avoids expressing the customer perspective in groups meetings; rather he projects his own perspective and when others don't agree, he shows displeasure."  *Id.*

Sprint support organization not involved in the decisionmaking process created these "password protected" cells, and that the managers involved in making discharge decisions did not have access to the password necessary to view the cells. Mr. Hinds responds that Sprint's protection of the data contained in the hidden cells was not foolproof because one who knows the hidden cells exist may access their information by electronically copying them into a new spreadsheet.[10] But Mr. Hinds has not developed any facts suggesting that the managers involved in the decision to fire him *actually accessed* the embedded age data in the spreadsheet or even knew how to evade the password requirement in the manner Mr. Hinds identifies. Thus, even assuming that an inference of discrimination could arise had decisionmakers seen the age data, the uncontested facts here fail to support such a theory. And we have long explained that information of which an employer is unaware cannot be inferred to be the basis for the employer's decision to take action against the employee. *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007).

---

[10] During Mr. Quirk's deposition, Mr. Hinds's counsel electronically copied the hidden data cells and pasted them into a new spreadsheet. Counsel asserts that the resulting spreadsheet revealed the information in the hidden data cells, including the employees' ages, and therefore Sprint managers with access to the spreadsheet could easily access the password protected data. *See* Aplt. App. at 633-34. Mr. Hinds does not present any evidence, however, suggesting that any decisionmaker had access to the password, knew about this alleged workaround, or otherwise accessed the information in the hidden data cells.

- 25 -

(iii)

As his final evidence of pretext, Mr. Hinds points out that the spreadsheet did not include three CCTTE employees – two who were retained in other positions and one who was discharged – even though their CCTTE jobs, like Mr. Hinds's, were eliminated in the RIF. Although he does not expand on this point, as best we can tell Mr. Hinds seems to be implying that the exclusion of these employees from the spreadsheet was inconsistent with Sprint's assertion that it created the spreadsheet to identify employees in groups impacted by the RIF.

Again, however, no material inconsistency is apparent from the record before us. Sprint employees uniformly testified that they created multiple spreadsheets focused on different skill sets; Mr. Hinds, for example, was included on the spreadsheet listing employees involved in "infrastructure support," as was Mr. Smith, the retained CCTTE employee who ultimately filled the open position for which Mr. Hinds was considered. Mr. Hinds has come forward with no facts suggesting that the three CCTTE employees not found on the "infrastructure support" spreadsheet could not be found on other spreadsheets appropriate to their job functions, or that the "infrastructure support" spreadsheet was incomplete in any other way. In fact, Mr. Quirk testified that he was involved in completing separate spreadsheets that did include each of the other CCTTE employees, and Ms. Fields testified that she verbally provided evaluations of all the CCTTE

- 26 -

employees while Mr. Quirk and Jeff Lentz typed the information into the various spreadsheets.[11]

\* \* \*

At the end of the day, Sprint's proffered nondiscriminatory explanation of its conduct – namely, that it terminated Mr. Hinds because it eliminated his entire group in the RIF and could find him no suitable replacement job elsewhere in the company, but retained seven younger non-CCTTE employees in Mr. Hinds's same pay grade because it did not eliminate their positions – is undermined by no credible evidence of pretext. That is, even when viewed through the prism of our summary judgment lens, Mr. Hinds's arguments about the candidate selection spreadsheet simply do not cast sufficient doubt on Sprint's explanation of its conduct that a rational factfinder could conclude it unworthy of belief.

B

Turning to his ADEA retaliation claim, Mr. Hinds alleges that Sprint terminated his employment because he complained of age discrimination, in violation of the ADEA's prohibition on discriminating against an employee who

---

[11] Even if one could somehow reasonably look at the "infrastructure support" spreadsheet in isolation, the fact remains that the other discharged CCTTE employee not listed on that particular spreadsheet was *younger* than Mr. Hinds and the two retained CCTTE employees not listed on that particular spreadsheet were *older* than Mr. Hinds; accordingly, their presence or absence on that single spreadsheet does not suggest age discrimination.

"has opposed any practice made unlawful" by the statute. 29 U.S.C. § 623(d).

Because Mr. Hinds admits he lacks direct evidence of retaliation, the *McDonnell Douglas* burden-shifting scheme again pertains. This time, however, our analysis begins and ends at the first *McDonnell Douglas* step because Mr. Hinds fails to establish a prima facie case of retaliation.[12] A prima facie case of retaliation requires the plaintiff to show that (1) he or she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed

---

[12] Some may question whether we should pause to assess the existence of a prima facie case when, at summary judgment, an employer puts forth a nondiscriminatory reason for its adverse employment action. *See, e.g.*, *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1225-26 (10th Cir. 2003) (Hartz, J., writing separately); *Brady v. Office of the Sergeant at Arms*, --- F.3d ---, 2008 WL 819989 (D.C. Cir. 2008). Although we readily concede that the prima facie case requirement may sometimes prove a sideshow to the main action of pretext, this court has indicated that it reserves the right to undertake each step of the Supreme Court's *McDonnell Douglas* framework in analyzing discrimination and retaliation claims on summary judgment, and has not infrequently dismissed such claims for failure to establish a prima facie case. *See Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1183 (10th Cir. 2002) (concluding that plaintiff failed to make a prima facie case of retaliation); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000) (emphasizing that, although the *McDonnell Douglas* "sequential analytical model" drops out after a trial on the merits, it applies on summary judgment). And, so long as *McDonnell Douglas* remains the law governing our summary judgment analysis, it seems to us that if an employee fails to present even the limited quantum of evidence necessary to raise a prima facie inference that his or her protected activity led to an adverse employment action, it can become pointless to go through the motions of the remainder of the *McDonnell Douglas* framework to determine that unlawful retaliation was not at play.

between the protected activity and the materially adverse action. *See Montes*, 497 F.3d at 1176. Before us, only the first and third elements are in dispute; Sprint does not, and could not, contest the intermediate question whether a reasonable employee would find the termination of his or her employment to be materially adverse.

1

With respect to the first element, Mr. Hinds asserts that he engaged in five instances of protected opposition to discrimination: (i) the June 2003 meeting with Mr. Joyce in human resources in which Mr. Hinds complained about Mr. Roberson's promotion to WFM manager and asked, among other things, "could this have been age discrimination"; (ii) Mr. Hinds's June 2003 e-mail to Sprint's CEO, Mr. Forsee, criticizing Sprint's internal politics, new performance evaluation system, and management philosophy, and commenting that he is older than many of his managers; (iii) the November 2003 e-mail to Mr. Joyce in which Mr. Hinds stated that his negative feedback about Sprint management had triggered retaliation; (iv) the PowerPoint presentation, which Mr. Hinds allegedly sent to Mr. Joyce and others in human resources and management in fall 2003; and (v) the January 2004 e-mail to Mr. Joyce, Mr. Forsee, and Mr. Kissinger, the head of Sprint human resources, complaining about Mr. Hinds's "high maintenance" performance review.

In response, Sprint argues that Mr. Hinds did not engage in protected opposition because his generalized employment complaints in the e-mails and PowerPoint did not complain of age discrimination or retaliation based on previous complaints of age discrimination, and because his question to Mr. Joyce was not sufficiently detailed opposition to age discrimination to constitute protected activity.

We agree that the November 2003 and January 2004 e-mails (items iii and v from Mr. Hinds's list above) are not examples of protected opposition. In the November 2003 e-mail, Mr. Hinds states that he feels retaliated against for giving negative evaluations of managers. In the January 2004 e-mail, he indicates that he is upset with the evaluation labeling him "high maintenance" for requiring high-level management and human resources time critiquing Sprint management paradigms and internal politics. Nowhere in either e-mail does Mr. Hinds mention or even allude to age or age discrimination. Indeed, at his deposition, Mr. Hinds himself admitted that his November 2003 e-mail did not reference age discrimination or seek to complain about age discrimination. Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice

made unlawful by the ADEA.[13]  General complaints about company management and one's own negative performance evaluation will not suffice.[14]

The remaining instances of alleged protected opposition – the June 2003 meeting with Mr. Joyce, the June 2003 e-mail to Mr. Forsee, and the PowerPoint presentation (items i, ii, and iv from above) – each at least mentions age or discrimination.  We need not resolve definitively whether these constituted protected activities, however, because the retaliation claim based on them clearly fails on the causal connection element.

2

To establish the requisite causal connection between his protected conduct and termination, Mr. Hinds must show that Sprint was motivated to terminate his employment by a desire to retaliate for his protected activity.  *See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003).  As a prerequisite to this

[13]  *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 985 (10th Cir. 1991), *overruled on other grounds by Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1228 (10th Cir. 2000); *see generally Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004) ("[A] vague reference to discrimination and harassment without any indication that this misconduct was motivated by [age] does not constitute protected activity and will not support a retaliation claim.").

[14]  *See, e.g.*, *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) (holding that employee's grievance about performance evaluation, which was not based on unlawful discrimination, did not constitute statutorily protected activity); *Ashkin v. Time Warner Cable Corp.*, 52 F.3d 140, 143-44 (7th Cir. 1995) (concluding that a complaint about management style, which does not mention unlawful harassment or discrimination, is not protected opposition).

showing, Mr. Hinds must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire him had knowledge of his protected activity. *See Montes*, 497 F.3d at 1176 ("To satisfy [the causal connection] element, a plaintiff must show that the individual who took adverse action against [him or her] knew of the employee's protected activity." (quotation omitted)).

Regarding his PowerPoint presentation (item iv), Mr. Hinds has presented no evidence that any decisionmaker at Sprint, or anyone aside from Mr. Joyce in human resources, received the presentation. To be sure, in his complaint to the Equal Employment Opportunity Commission, Mr. Hinds alleged that he sent the PowerPoint presentation to a number of Sprint managers and human resources personnel on some unknown date. But we are now on summary judgment where facts matter and Mr. Hinds does not point to any facts in the record before us supporting this allegation – no e-mail, no affidavit or deposition testimony by him or others, no other form of competent evidence indicating that anyone besides Mr. Joyce saw the PowerPoint. Indeed, in his motion to reconsider, Mr. Hinds represented to the district court only that he sent the presentation to Mr. Joyce in November 2003. In turn, Mr. Joyce's (uncontested) testimony nowhere hints that he shared the PowerPoint or even the fact of its existence with anyone else at Sprint. This is significant because Mr. Joyce is not alleged to have taken any part

in the decision to discharge Mr. Hinds, and, even accepting as true the only evidence Mr. Hinds developed in and cited to the district court regarding the dissemination of the PowerPoint presentation, no person involved in his termination decision received or knew of it.

The only remaining allegedly protected activities are Mr. Hinds's June 2003 conversation with Mr. Joyce and his June 2003 e-mail to Mr. Forsee (items i and ii). Mr. Hinds argues that we should infer retaliatory motive from the timing of his discharge in relation to these events. And, to be sure, we may infer retaliatory motive from a close temporal proximity between an employee's protected conduct and an employer's adverse employment action. *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007). But unless the termination is very close in time indeed to the protected activity, we have held that a plaintiff cannot rely on temporal proximity alone and must come forward with additional evidence to establish causation. *Id.*; *see Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). More specifically, we have held that a one-and-a-half-month period may suffice to establish causation on a prima facie basis, but a three-month period, standing alone, will not suffice. *See Anderson*, 181 F.3d at 1179.

Here, Sprint discharged Mr. Hinds eleven months after his meeting with Mr. Joyce and e-mail to Mr. Forsee, a time span too extended to infer retaliatory

motive under our precedent. Mr. Hinds seeks to avoid this conclusion by suggesting that he began experiencing adverse employment actions from his protected activity when he received a negative review in September 2003, and that similar adverse employment actions continued through his eventual termination. In aid of this argument, he points to our decision in *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996), in which we explained that a "pattern of retaliatory conduct [that] begins soon after the [protected activity] and only culminates later in actual discharge" may sometimes provide temporal proximity sufficient to infer retaliatory motive and preclude summary judgment. The difficulty with such an argument in this case is that over three months elapsed between Mr. Hinds's June 2003 conversation with Mr. Joyce and e-mail to Mr. Forsee and the September 2003 performance rating he cites as the first adverse action in his alleged pattern of retaliation. And under our case law, a "three-month period of time between [the] protected activity" and this first alleged instance of retaliation is "insufficient to establish a causal connection" as a matter of law. *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997); *see Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007) (acknowledging that an adverse employment action occurring three months after the protected activity cannot, standing alone, demonstrate causation); *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1183-84 (10th Cir. 2002) (concluding that a period of

"[a]lmost three months" between the protected activity and the alleged retaliatory act does not permit an inference of causation).[15]

* * *

As did the district court before us, we conclude that Mr. Hinds has failed to establish a triable question of pretext about the reasons for his discharge, and that he has failed to present evidence from which a reasonable jury could infer a retaliatory motive for his termination.

*Affirmed.*

---

[15] Neither does Mr. Hinds present us with any special circumstances or any arguments concerning why this particular gap in time might be sufficient when it otherwise would not. *See, e.g.*, *Wells*, 325 F.3d at 1216-17 (holding that, although a five-month gap generally does not establish causation, because the plaintiff went on leave two days after her complaint and suffered the adverse action seven days after returning to work—five months after the complaint—a jury could infer retaliation from the timing of the events). To be sure, seeking to identify additional evidence of causation beyond temporal proximity, Mr. Hinds again points us to the candidate selection spreadsheet, repeating his three arguments about its meaning. But, as we have already explained in the course of examining Mr. Hinds's age discrimination claim, these arguments do not cast doubt on Sprint's proffered age-neutral reason for his termination, namely the elimination of the CCTTE group in the RIF. *See supra* Part II.A.3. By necessity it follows that they do not suggest a causal connection between Mr. Hinds's complaint of age discrimination and his termination.