**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 19, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

THARON PAUP; CAROL J.
SHUFFITT; GWEN COFFELT,

      Plaintiffs-Appellants,

v.

GEAR PRODUCTS, INC., a
corporation,

      Defendant-Appellee.

No. 07-5164
(D.C. No. 4:05-CV-214-TCK)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **HARTZ**, and **GORSUCH**, Circuit Judges.

      Gear Products, Inc. discharged Gwen Coffelt, Tharon Paup, and Carol

Shuffitt in 2001. The three former employees filed suit contending that the

company based their discharge on impermissible age discrimination in violation

of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*

("ADEA"). The district court granted summary judgment to Gear Products, and

the plaintiffs now seek reversal of that disposition.

---

    [*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Before we reach the merits of the plaintiffs' ADEA claims, Gear Products submits that Ms. Coffelt's claim should be dismissed because she failed to disclose it as an asset in her personal bankruptcy proceedings. In the company's view, Ms. Coffelt should not be allowed to keep for herself an asset she had a duty to reveal and potentially remit to her creditors during her bankruptcy. Our precedent compels us to agree and so we affirm the entry of summary judgment against Ms. Coffelt on this basis. Arriving at the merits of Ms. Paup's and Ms. Shuffitt's remaining ADEA claims, and viewing the facts adduced at summary judgment in the light most favorable to the employees, we conclude that those plaintiffs have advanced a prima facie case of age discrimination and proffered evidence from which a reasonable trier of fact could find Gear Products's nondiscriminatory reasons for their discharge pretextual. At the end of the day, then, we reverse the district court's entry of summary judgment against Ms. Paup and Ms. Shuffitt but affirm its entry against Ms. Coffelt.

I

A

From its Tulsa, Oklahoma production facility, Gear Products sells power transmissions and gears used in the forestry, construction, and utilities industries. In early 2001, the company began to experience a series of financial setbacks. Responding to its difficulties, the company asked for voluntary resignations, cut back on overtime, reduced its workforce by way of attrition, and consolidated

vacant positions. Despite its efforts, Gear Products's parent company, Blount International, Inc. ("Blount"), instructed Gear Products that it needed to reduce its operating costs further by undertaking what became a series of three reductions in force ("RIF") that led to the discharge of approximately 39 (out of some 170 or so) employees.

In the particular RIF that gives rise to the suit before us, Gear Products's third, Blount told Gear Products that, despite all the company's prior efforts and two earlier RIFs, at least three more employees had to go. Tim Simmons, the company's Fed.R.Civ.P. 30(b)(6) corporate representative, offered the following as his understanding of how Gear Products responded.

Gear Products's President, Tom Brenton, called a meeting with his management committee to decide which employees would be discharged. Besides Mr. Brenton, the committee included Mr. Simmons, the company's controller, human resources manager Robin Bond, vice-president of engineering Steve Copeland, quality manager Dick Gregory, as well as sales and marketing vice president Jeffrey Schmale. The committee was informed that Gear Products's core business would be best insulated from adverse effects if the RIF were limited to the company's eight administrative or clerical employees, a pool that included the plaintiffs. The committee then agreed to rank each of the eight employees on a five-point scale in each of the following categories: flexibility, sense of

urgency, initiative, self-starter, multitasking abilities, accuracy, and attitude. The three lowest-ranked employees would be released.

After committee members finished scoring each employee, the committee disbanded while either Mr. Brenton or Ms. Bond compiled the scores. The scores were as follows, together with each employee's age at the time, and the three plaintiffs before us noted in bold:

| Name | Score | Age |
|------|-------|-----|
| Sally Farmer | 28 points | 50 |
| Alissa Tanner | 19.5 points | 33 |
| Brian Callendar | 19 points | 36 |
| Bill Vickers | 19 points | 50 |
| **Gwen Coffelt** | **18.5 points** | **63** |
| **Tharon Paup** | **15 points** | **58** |
| Peggy West | 15 points | 58 |
| **Carol Shuffitt** | **10 points** | **59** |

When the other committee members returned, they were told that Ms. Shuffitt, Ms. Paup, and Ms. Coffelt would be discharged. They were not informed of the employees' scores in the rankings. Neither were they informed that Ms. Bond or Mr. Brenton deviated from the plan to discharge the three lowest-ranked employees by selecting Ms. Coffelt, rather than Ms. West, for discharge.

B

Believing their terminations were based on unlawful age discrimination, the plaintiffs filed suit before the Oklahoma Human Rights Commission ("OHRC").[1] In response to the suit, Ms. Bond (evidently) prepared a document entitled the "Overview Matrix," which purports to explain why each employee was terminated.[2] The Overview Matrix tells a somewhat different story about the plaintiffs' termination than the one the company's corporate representative, Mr. Simmons, offered as his understanding.

For Ms. Paup, the Overview Matrix represents that the company informally approached her with the idea of transferring her from her current position as purchasing coordinator to a position she had held previously. Had she "shown any interest in returning to her original position," she would likely not have been terminated. App. at 106. But she indicated her reluctance to move. According to the Overview Matrix, the company then decided that, "while [her] work

---

[1] The OHRC is empowered under 74 Ok.St.Ann.§ 953(e) to receive and investigate complaints of discrimination. The OHRC can recommend ways of eliminating injustice occasioned by the discrimination and can serve as conciliator; it has no independent method of enforcing its determinations. *Id.* If a complainant before the OHRC receives a "reasonable cause" determination, he or she can pursue the claim through the Equal Employment Opportunity Commission (pursuant to a work-sharing agreement) or invoke the right to sue under Title VII (as plaintiffs did in this case).

[2] At least, Mr. Simmons testified that he "believe[d]" that the Overview Matrix was prepared by Ms. Bond. App. at 318. We have no indication other than his testimony as to who else at Gear Products might have contributed to the drafting of the document.

performance was good," it had to terminate her because "her position was recognized as one that had to be eliminated to cut costs, at least temporarily." *Id.* Because it could not lay off Ms. Paup until another employee, whose work Ms. Paup had temporarily taken over, returned from FMLA leave, the company decided to delay the layoffs.

As for Ms. Shuffitt, the company asserts in the Overview Matrix that "the decision to eliminate [her] position was made mainly due to the fact that her position was one that would have the least negative impact on the organization as a whole." *Id.* at 116. The Overview Matrix notes some performance issues Ms. Shuffitt had been having – such as talking too much with others and not learning necessary software skills – and references her low score in the rankings process undertaken by the management committee. The company explored placing Ms. Shuffitt in a sales secretary position as it was non-expendable, but ultimately decided against doing so because of the steep learning curve that would be involved. Another option the company explored was to place Ms. Shuffitt in the switchboard operator position, which was also deemed non-expendable. However, another employee, Ms. West, excelled in that position, and Ms. Shuffitt had indicated previously that she resented doing tasks she perceived as beneath her; Ms. West thus was retained for the position over Ms. Shuffitt.

Finally, regarding Ms. Coffelt, the Overview Matrix begins by noting that her position was "highly administrative" and that "some things were done by [her]

because she desired to have control of all processes." *Id.* at 121. "Due to the economic times," the company could not "afford the luxury of someone who checked and re-checked." *Id.* When the company informed Ms. Coffelt that it was eliminating her position, she asked for the position of a CAD designer. However, transferring her to that position would require extensive training, and the company explains that "[w]hile we would have liked to have had the time to train Gwen [Coffelt], it was not feasible under these circumstances." *Id.*

When confronted with the Overview Matrix at his deposition, the company's corporate representative stated that he had no knowledge of the facts it contains. Neither does the document identify the individuals who purportedly made the decisions described by the Overview Matrix, speaking instead in the voice of the indeterminate "we." When asked whether there is "any way the company could know whether those things happened or didn't happen . . . other than the document itself" the company's corporate representative replied simply "other than the document itself," implying no. *Id.* And when asked "[a]s far as you know, there is no way for the company to determine who the actors [are that] were involved; is that true?" he answered "[t]hat's correct." *Id.*

C

Eventually plaintiffs received authorization to sue from the OHRC and brought this age discrimination suit in federal court. After two years of discovery, Gear Products moved for summary judgment on the basis that the

plaintiffs failed to establish a triable question of age discrimination. The company also moved for summary judgment against Ms. Coffelt on the basis of judicial estoppel. Gear Products noted that, following the filing of this lawsuit, Ms. Coffelt declared bankruptcy but failed to disclose her ADEA claim as a potential asset in any relevant portion of her bankruptcy pleadings; the company argued that Ms. Coffelt should not be permitted to "hide" a potentially valuable lawsuit from her creditors while pursuing it for herself.

The district court denied summary judgment on judicial estoppel grounds, but granted it on the merits of plaintiffs' ADEA claims. After Gear Products filed its motion for summary judgment, but before the district court's ruling, Ms. Coffelt reopened her bankruptcy proceedings, disclosed her ADEA lawsuit, and successfully moved to have a bankruptcy trustee substituted for her in this suit. In light of these developments, the district court found estoppel inappropriate. The trustee, the court noted, had done nothing wrong and was pursuing the claim for the benefit of Ms. Coffelt's creditors. The court saw no reason to punish the trustee and Ms. Coffelt's creditors for any wrong committed only by Ms. Coffelt. The court cautioned, however, that had Ms. Coffelt remained a party before it, it might have applied judicial estoppel. Turning to the merits of plaintiffs' ADEA suit, the district court granted Gear Products's summary judgment motion, holding that the company had offered legitimate reasons for its behavior and that

plaintiffs had failed to present evidence from which a reasonable jury could find those reasons pretextual.

Ms. Paup and Ms. Shuffitt now appeal. Ms. Coffelt, but not her bankruptcy trustee, also seeks to appeal. After assessing the district court's summary judgment decision, the trustee declined to pursue this matter further on behalf of Ms. Coffelt's creditors. Under 11 U.S.C. § 554(c),[3] Ms. Coffelt's ADEA claim reverted back to her for her own personal benefit, and it is she (alone) who appeals the disposition of her claim.

## II

Prior to reaching the merits of the plaintiffs' ADEA claims, Gear Products urges us to revisit the question of judicial estoppel with respect to Ms. Coffelt. The company does not question the district court's decision to permit a trustee to pursue her ADEA claim. But, the company argues, Ms. Coffelt should not be permitted to reinsert herself into this suit and pursue it on her own behalf. Our precedent compels us to agree.

## A

Judicial estoppel is an equitable doctrine aimed at "protect[ing] the integrity of the judicial process by prohibiting parties from deliberately changing

---

[3] 11 U.S.C. § 554(c) states in pertinent part: "[A]ny property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 305 of this title."

positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (citation and internal quotations omitted). Where a party successfully asserts a position in a legal proceeding, he or she may not assert a contrary position in later proceedings "simply because his [or her] interests have changed." *Id.* at 749.

While the doctrine is discretionary, we have generally applied it when three factors are met. *Id.* at 750. First, "a party's subsequent position must be clearly inconsistent with its former position." *Eastman v. Union Pacific R.R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007) (internal quotation marks omitted). Second, a party must succeed "in persuading a court to accept that party's former position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled." *Id.* (emphasis, brackets, and internal quotation marks omitted). Third, we must find that "the party seeking to assert an inconsistent position would gain an unfair advantage in the litigation if not estopped." *Id.* In evaluating these factors at summary judgment, we view the facts, and all reasonable inferences that can be drawn from them, in the light most favorable to the party against whom estoppel is sought. *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008).

In asking whether Ms. Coffelt has taken "clearly inconsistent" litigation positions, *Eastman*, 493 F.3d at 1156, we look to the information Ms. Coffelt supplied in her bankruptcy petition and compare it with the actions she took in her ADEA case. After receiving a federal right to sue letter from the OHRC, Ms. Coffelt exercised that right by filing her ADEA claim in federal court on April 20, 2005. Less than six months later, and in the midst of discovery, Ms. Coffelt and her husband filed for Chapter 7 bankruptcy. As part of her petition, Ms. Coffelt was required to complete a Statement of Financial Affairs. Question 4 asked Ms. Coffelt to "[l]ist all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case." App. at 146 (emphasis added). Despite the fact that she had filed her lawsuit just six months earlier, Ms. Coffelt checked the box "None," and then signed under penalty of perjury that her statements were accurate. *Id*. at 146, 150. Her position in the bankruptcy court was thus inconsistent with her position before the district court: she represented to her creditors that she had no pending lawsuit while pursuing just such a suit for her own benefit.

Ms. Coffelt does not explain why she failed to disclose her ADEA suit. She does not assert, for example, that she was confused about the meaning of the question. Or that she forgot about her ADEA suit when compiling her petition. *See Eastman*, 493 F.3d at 1157 (judicial estoppel may not apply if the "party's

prior position was based on inadvertence or mistake"). Neither could she readily do so. Ms. Coffelt apparently understood the meaning of "suit" well enough to file one after the OHRC notified her that she had such a right. *See id.* at 1159 (plaintiff understood the meaning of "suit" because he listed two collection suits against him in the same petition in which he omitted a suit from which he could gain financially). And she filed her ADEA suit less than six months before her bankruptcy petition, so it would be difficult indeed "to believe that such a sizable claim could have been overlooked when [she] was filling in the bankruptcy schedules." *Id.* (internal ellipsis omitted).

2

We next ask whether Ms. Coffelt "succeeded in persuading" a court to accept her inconsistent position such that the situation "create[s] the perception" that the bankruptcy court was misled. *Id.* at 1156. Our concern is not so much with whether Ms. Coffelt acted with some nefarious motive as it is with whether her actions led the bankruptcy court "to accept [her] position, so that judicial acceptance of an inconsistent position in a later proceeding" would introduce the "risk of inconsistent court determinations and thus pose . . . [a] threat to judicial integrity." *New Hampshire*, 532 U.S. at 750, 751 (internal citation omitted); *see also Eastman*, 493 F.3d at 1159 (the fact that a debtor's conduct was the result of being "'unsophisticated' and 'unschooled'" or the result of his or her attorney having "'bl[own] it' is insufficient to withstand application of the doctrine").

We find such concerns present here. Based on her incomplete bankruptcy disclosures, the trustee appointed to administer Ms. Coffelt's estate concluded that she did not have *any* assets, a position the bankruptcy court subsequently adopted when it granted Ms. Coffelt a "no asset" discharge. App. at 159-60. This discharge relieved Ms. Coffelt of her debts without her having to reimburse her creditors. *See id.* at 391. Yet, in her ADEA litigation, Ms. Coffelt claimed an asset for herself that predated her bankruptcy – she, rather than her creditors, sought the full benefit of this pre-petition asset. We have previously held that just such a result gives rise to "the obvious perception" that the bankruptcy court was misled. *Eastman*, 493 F.3d at 1159. This perception is made even more apparent because Ms. Coffelt disclosed her ADEA claim to her creditors and the bankruptcy court only when her failure to do so was revealed by Gear Products's summary judgment motion.

3

The final question before us is whether, if Ms. Coffelt were allowed to pursue her ADEA claim, she "would gain an unfair advantage" over her bankruptcy creditors. *Id.* at 1156. It is here that Ms. Coffelt mounts her primary defense against the application of judicial estoppel. She argues that, while she may not have disclosed this lawsuit in her initial bankruptcy petition, she did (eventually) reveal the suit. In light of the fact that she ultimately disclosed the suit and gave her trustee the chance to pursue it for her creditors' benefit – a

- 13 -

chance the trustee ultimately abandoned – she argues there is nothing "unfair" in allowing her to proceed with this appeal.

Whatever we might make of Ms. Coffelt's argument were we writing on a blank slate, it is foreclosed by our precedent. In *Eastman* we applied judicial estoppel to preclude an appeal in virtually identical circumstances, holding that a party should not be allowed to "'back up' and benefit from the reopening of his [or her] bankruptcy only after [the] omission had been exposed." *Id.* at 1160. If debtors could do so, they would have little incentive to be "completely truthful" in their initial disclosures. *Id.* at 1159. Instead, they would have a non-trivial incentive to try to game the system by disclosing civil lawsuits in their bankruptcy proceedings only when they must, not when they should. *Id.*

We see no way fairly to distinguish *Eastman*'s holding or rationale in Ms. Coffelt's case. In *Eastman*, just as here, a personal injury plaintiff, Wayne Gardner, moved to reopen his bankruptcy proceedings and disclose his personal injury claim only after his personal injury attorney discovered that Mr. Gardner had misled the bankruptcy court by concealing his lawsuit. *Id.* at 1154. A bankruptcy trustee then intervened in Mr. Gardner's stead in the personal injury suit, settled with two defendants, recouped enough assets to make Mr. Gardner's creditors whole, and eventually abandoned any claims against the remaining defendants. *Id.* at 1155. At that point, Mr. Gardner sought to reenter the suit and appeal an adverse ruling, stressing that he had rectified his initial failure to

disclose, that his trustee had abandoned the suit, and that his creditors had been made whole. *Id.* at 1155, 1160. We nonetheless applied judicial estoppel to preclude his appeal, noting that any other result would encourage debtors to disclose assets only when they are "caught concealing them." *Id.* at 1160. Exactly the same circumstances save one pertain here. Unlike Mr. Gardner, Ms. Coffelt seeks to pursue damages for her own benefit in a case for which her creditors have received and will receive nothing. Surely this cuts even further against allowing Ms. Coffelt to proceed.

III

This still leaves Ms. Paup's and Ms. Shuffitt's appeal of the district court's summary judgment dismissal of their ADEA claims. An ADEA claim arises when an employer "discharge[s] an[] individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Because Ms. Paup and Ms. Shuffitt rely on circumstantial evidence to prove their claim, we analyze whether summary judgment is merited in accord with the framework suggested by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under *McDonnell Douglas*, the plaintiffs bear the burden of establishing a prima facie case of age discrimination. If they succeed in doing so, the defendant must come forward with some legitimate, non-discriminatory reason for the adverse employment action. If the defendant shoulders this obligation, the burden shifts back to the plaintiffs to present evidence from which a reasonable factfinder could conclude that the employer's

- 15 -

offered reason is pretextual. *See Hinds*, 523 F.3d at 1195. In this, as in all summary judgment dispositions, our review of the district court's decision granting summary judgment to Gear Products is *de novo*, viewing the facts, and all reasonable inferences those facts support, in the light most favorable to Ms. Paup and Ms. Shuffitt as the non-movants. *Id.*

A

To make out a prima facie case of age discrimination under *McDonnell Douglas*, plaintiffs affected by a RIF must show that they (i) were within a protected age group, (ii) were doing satisfactory work, (iii) were discharged despite the adequacy of their work, and (iv) have *some* evidence the employer intended to discriminate. *Id.* at 1195. The prima facie hurdle is not an onerous one, *see Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005), and in our case only the second and fourth elements are at issue; it is undisputed that Ms. Shuffitt and Ms. Paup fell within the protected age group and were discharged.

On the second element, plaintiffs have put forth evidence, in the form of their lengthy tenures at Gear Products and their survival of two prior RIFs, that they were doing satisfactory work. Gear Products argues that at least Ms. Shuffitt was performing inadequately, stressing that she was previously counseled about tardy work product, gossiping with coworkers, and unacceptable time spent away from her desk. But, however considerable Gear Products's evidence and though it

may be relevant to later stages of the *McDonnell Douglas* inquiry, at the prima facie stage Ms. Shuffitt need only provide "some evidence of good performance" to carry her burden. *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1420 (10th Cir. 1991). That much she has done.

On the fourth element, plaintiffs have presented evidence that they were terminated during a RIF process in which similarly situated younger employees were retained. Our precedent is clear that "a plaintiff who is fired pursuant to a[n] RIF and who held a similar position to a younger retained employee can satisfy the fourth element." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1167 (10th Cir. 1998); *see also Hinds*, 523 F.3d at 1195-96. Mr. Simmons and the Overview Matrix both describe the pool of employees considered for termination as consisting of eight employees occupying administrative and clerical support positions. App. at 85-86, 102. Of the employees retained from this pool, none was older than the plaintiffs, and four were younger. While Gear Products stresses that two of the similarly situated employees were younger than Ms. Paup by only eight years, and that such an age difference is insignificant as a matter of law, in *Whittington v. Nordham Group Inc.*, 429 F.3d 986, 995 (10th Cir. 2005), we rejected an employer's argument that a difference of five years is legally insignificant; of course, if five years can be significant, so can eight. Because Ms. Paup and Ms. Shuffitt were terminated in a RIF process in which younger, similarly situated employees were retained, they have satisfied the fourth element.

As to Ms. Paup, Gear Products replies that, because the company first hired her when she was already within the age class protected by the ADEA (Ms. Paup was forty-five when hired), a reasonable factfinder could not infer that the company would later discriminate against her on the basis of age. In support of this contention, the company cites *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359 (7th Cir. 2001). In that case, a 54-year-old plaintiff "was hired specifically to service a large health care client of the defendant." *Id.* at 360. A few weeks later, the employer lost the client, discontinued its health-care practice, and then discharged the plaintiff only five months after he had been hired. *Id.* Affirming the district court's grant of summary judgment to the employer, the Seventh Circuit observed that

> it is eminently reasonable to doubt that . . . a worker hired at an age well beyond that at which the protections of the age discrimination law click in and terminated *within months*, that is, before he is appreciably older, was a victim of age discrimination. A company that didn't want 54-year-olds on its payroll would be unlikely to hire one rather than to hire one and promptly fire him, thus inviting a lawsuit because terminated workers are much more likely to sue than ones who have merely not been hired, because of the greater difficulty of proving damages in the latter case.

*Id.* at 361–62 (citations omitted).

While we agree entirely with the Seventh Circuit's analysis, we disagree with Gear Products that it pertains to Ms. Paup. Unlike Mr. Kadas, Ms. Paup worked for Gear Products not for a matter of mere months, but for thirteen years, and she had become "appreciably older" by the time she was terminated. Age is

unusual in that it is a protected class in which an employee becomes more susceptible to unlawful discrimination over time. Simply because an employer harbors no age animus toward forty-five year-old employees does not necessarily mean it feels the same about fifty-eight year-old employees. Moreover, Mr. Kadas was hired and fired by the same manager, and it would be eminently unreasonable to think that the manager became "ageist" overnight. By contrast, Ms. Paup had many managers over the course of her tenure at Gear Products, and was under the management of a new president at the time of her termination. Now, all this is not to say Gear Products lacks a triable argument that any inference of age discrimination in the RIF process is disproven by the company's practice of hiring people in the ADEA's age protected class. It is only to say that Gear Products's plausible trial argument is insufficient to defeat Ms. Paup's prima facie case.

B

Because Ms. Paup and Ms. Shuffitt have cleared the hurdle of establishing a prima facie case, the burden shifts to Gear Products to advance a legitimate nondiscriminatory reason for its discharge decision. To succeed does not require much. Gear Products "need not persuade the court that it was actually motivated by the proffered reasons," but must merely "set forth, through the introduction of admissible evidence, the reasons for the plaintiff's [termination]." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981).

Gear Products has met its burden in this case. Before us, Gear Products explains that it discharged Ms. Paup because her position "was completely eliminated because it was primarily clerical in nature and the responsibilities of the position could be easily absorbed by others or eliminated in their entirety." Appellee. Br. at 24. Its explanation is supported by citations to the Overview Matrix, in which the company explains that, "[w]hile Tharon[] [Paup's] work performance was good, her position was recognized as one that had to be eliminated to cut costs." App. at 106. As for Ms. Shuffitt, the company's brief asserts that her discharge was based on the fact that her position "was eliminated because it was not a full-time position. It was determined that the minimal duties of the executive administrative assistant position could be easily absorbed by others or eliminated in their entirety." Appellee Br. at 27-28. Here again the company's explanation is supported by a citation to the Overview Matrix, which confirms that "[t]he decision to eliminate Carol[] [Shuffitt's] position was made mainly due to the fact that her position was one that would have the least negative impact on the organization as a whole." App. at 117. In no uncertain terms, then, Gear Products asserts before us that it terminated Ms. Paup and Ms. Shuffitt based on the legitimate and nondiscriminatory reason that their positions were expendable.[4]

---

[4] For Ms. Shuffitt (but not Ms. Paup) the Overview Matrix also references her weak performance scores in the management committee's ranking process.

(continued...)

Plaintiffs respond in part by challenging the admissibility of the Overview

Matrix on which Gear Products's proffered business justifications rely.  And

plaintiffs surely have something of a point.  The Overview Matrix is supported by

neither an affidavit nor a declaration from an individual with personal knowledge

of the facts it contains, as required in summary judgment practice.  *See* Fed. R.

Civ. P. 56(e)(1).  Worse still, the document itself never identifies any person who

made any decision (again, speaking only in the indeterminate plural voice, "we")

and it was prepared by the company not in the ordinary course of business but in

anticipation of, even in the midst of, litigation before the OHRC.  Despite these

glaring deficiencies, however, it is debatable whether plaintiffs' adequately raised

their evidentiary objection to the document.[5]  Given this, and given that Gear

---

[4](...continued)
Nevertheless, the Overview Matrix does not indicate that the company considered Ms. Shuffitt's performance a principal reason for her termination.  *See* App. at 117.  Neither does the company indicate in its brief before us that her performance, as opposed to the expendability of her position, was a reason for her termination.

[5]  Before the district court the plaintiffs objected to the Overview Matrix as "hearsay that has not been identified by testimony from its originator."  App. at 176.  On appeal, the plaintiffs protest that the Overview Matrix is "neither identified, authenticated nor shown to be based on personal knowledge." *Id.* at 337.  These objections are arguably different, focusing on hearsay before the district court and authentication on appeal – hence the question whether the plaintiffs have satisfied a "basic principle" of evidentiary challenges on appeal: that the specific ground for such a challenge be the same as the one raised before the district court.  *See Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1331 (10th Cir. 1984).  At the same time, one could well argue that the plaintiffs' district court objection focused not just on hearsay but also on whether the

(continued...)

- 21 -

Products's defense fails even with the Overview Matrix, we assume without deciding that the Overview Matrix is admissible.

C

At step three of the *McDonnell Douglas* inquiry, the burden shifts back to Ms. Paup and Ms. Shuffitt to show that a reasonable jury could find Gear Products's proffered reasons pretextual. The plaintiffs may meet their burden by establishing that the reasons are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Young v. Dillon Co.,* 468 F.3d 1243, 1250 (10th Cir. 2006). Gear Products explains that Ms. Paup and Ms. Shuffitt were discharged largely on the basis that their positions could be eliminated with the least impact on the company. We do not quibble with the reasonableness or legitimateness of a layoff decision premised on the expendability of positions. But there remain several reasons, taken together, why a reasonable jury might discredit Gear Products's proffered explanations.

First, the only putative evidence the company cites in support of its explanations is the Overview Matrix. But, as we've noted, it appears this document was prepared by Ms. Bond in response to this very lawsuit. Even

---

[5](...continued)
Overview Matrix was "identified," another term used in Fed. R. Evid. 901 for authentication. And it is certainly plain that the Overview Matrix has never been properly authenticated.

assuming its admissibility, the circumstances surrounding its creation could surely cause a reasonable factfinder to view it with a degree of skepticism. *See Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1020 (10th Cir. 2004) (in context of employment retaliation claim, stating that the "business significance of [a] document outside the litigation context" is a factor indicative of the document's trustworthiness under the business records exception to the hearsay rule); *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 205 (4th Cir. 2000) ("The absence of trustworthiness is clear . . . when a report is prepared in the anticipation of litigation because the document is not for the systematic conduct and operations of the enterprise but for the primary purpose of litigating."); *cf. Jaramillo v. Colo. Judicial Dep't.*, 427 F.3d 1303, 1311 (10th Cir. 2005) ("The timing of the change [in the employer's explanation for its decision] has been found to support the inference of pretext when it occurs after significant legal proceedings have occurred.").

Second, the Overview Matrix also fails to name any of the decisionmakers who purportedly made the decisions it describes, speaking instead as if all decisions were made only by an impersonal "we." A crucial factor in the termination process, then, is left a mystery, and we are provided no justification for why the company was unable or unwilling to name names. This fact, too, casts a shadow of doubt over Gear Products's explanations. *See Coburn v. Rockwell Automation, Inc.*, 2007 WL 1892091, at *10 (6th Cir. 2007) (in

employment age discrimination suit, holding that "[a] reasonable jury could infer that if [employer] cannot even give a straight answer about who recommended [plaintiff] for the RIF list, it is trying to hide something"); *cf. Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997) (inconsistent statements by different managers as to "who was actually responsible for the decision to fire" plaintiff raised genuine issue of material fact regarding employer's proffered reason for terminating plaintiff).

Third, the company was unable to supply any individual whose testimony might mend these infirmities. Quite the opposite. When Gear Products's own Rule 30(b)(6) corporate representative, Mr. Simmons, was directed to portions of the Overview Matrix, he disavowed personal knowledge of the facts it contained. *See* App. at 318, 324. And when specifically asked whether anyone in the company might know whether discussions referenced in the Overview Matrix actually happened, or whether someone might be able to identify the relevant decisionmakers the Overview Matrix leaves unnamed, he answered in the negative. *Id.* at 324. *Cf. Hulbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286 (11th Cir. 2006) (recognizing "an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext," and finding lack of documentation of articulated reasons for discharge suggestive of pretext).

Fourth, Mr. Simmons testified that his understanding had been that the plaintiffs were chosen for discharge for reasons altogether different from, and incongruous with, the reasons asserted in argument before us and provided in the Overview Matrix. The company, pointing to the Overview Matrix, explains that the two employees were terminated primarily because their positions were expendable; for Ms. Paup, the Overview Matrix goes so far as to state explicitly that her performance was *good*. Yet, the company's corporate representative testified that, at the time of the employees' terminations, he believed the employees were chosen *solely* on the basis of their poor performance, as determined in the management committee's ranking process. Mr. Simmons was unable to explain or reconcile the different rationales offered by Gear Products. Neither could he explain why Ms. Coffelt, rather than Ms. West, was discharged despite her higher performance rankings. Mr. Simmons insisted that he understood the firings would be based solely on the committee's rankings, without deviation, but of course deviation there was. We have, then, the company's Rule 30(b)(6) representative testifying to an understanding of the reasons for the employees' terminations that is altogether different than the reasons Gear Products proffers to us today; and whose own understanding also suffers from unexplained difficulties. *See Whittington*, 429 F.3d at 994 (An

"indication of pretext is that [defendant-employer] was inconsistent in the reasons it provided for termination.").[6]

In concluding that these factors, taken together, suffice to suggest pretext, we do not mean to suggest that a company can never change its mind, even in the midst of a RIF process, about the factors that it wishes to consider in deciding whom to terminate. Neither do we suggest that a company may not have more than one legitimate reason for terminating an employee, or that such reasons may not be inconsistent. At trial, the question before the jury will be whether Gear Products engaged in age discrimination, and a defendant is normally free to pursue inconsistent lines of defense to refute the conclusion that its actions were motivated by ageism. It is thus conceivable that at trial Gear Products will argue, and even argue successfully, that, whether it fired employees for poor performance or for expendability, it did so without age-based animus.

---

[6] To be sure, Gear Products does not ignore the management committee's rankings process in its brief before us. It references the process at a number of instances, for example in its fact section and when seeking to refute Ms. Shuffitt's prima facie case by arguing her performance was unsatisfactory. *See* Aplt. Br. at 26; *supra* at 16-17. But, in no uncertain terms, in its legal argument section the company asserts that its legitimate, nondiscriminatory reason for firing both Ms. Paup and Ms. Shuffitt was that their positions could be eliminated with minimal repercussions on the business. Aplt. Br. at 24, 27-28. *See Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009) (in suit alleging wrongful termination in violation of free speech rights, court of appeals did not consider reasons for plaintiff's termination asserted in fact section but not legal argument section of defendant's brief).

The fact remains, however, that we are now at summary judgment, obliged to apply the *McDonnell Douglas* framework. And we have repeatedly held that employees may meet their summary judgment burden of showing pretext under *McDonnell Douglas* by demonstrating that their employer's proffered business justifications are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief. This showing of pretext, of reason to disbelieve, by definition, "does not require a plaintiff to offer any direct evidence of actual discrimination." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007). For this and other reasons, some have criticized *McDonnell Douglas* as improperly diverting attention away from the real question posed by the ADEA – whether age discrimination actually took place – and substituting in its stead a proxy that only imperfectly tracks that inquiry. *See, e.g., Wells v. Colo. Dept. of Transp.*, 325 F.3d 1205, 1221-28 (10th Cir. 2003) (Hartz, J., concurring); *MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1122-23 (10th Cir.1991) (Seth, J., concurring); *see generally* Timothy M. Tymkovich, *The Problem with Pretext*, 85 Denv. U. L. Rev. 503 (2008). But *McDonnell Douglas* of course remains binding on us. And here we have a confluence of factors suggesting precisely the sort of pretext necessary for the plaintiffs to survive summary judgment under that decision's terms – a company whose only evidence supporting its proffered explanation for the firings is contained in a document prepared in response to litigation; a document

purporting to explain termination decisions that leaves key decisionmakers unnamed; a company representative who has no personal knowledge of facts within this document; and the same representative who testifies that his understanding had been that employees were terminated for reasons different than the ones the company proffers to us today (yet whose competing understanding also suffers from another admitted difficulty).

It is only in light of these (rather unusual) circumstances, when viewed in their totality, that we conclude that a reasonable jury could well decide that Gear Products's proffered business reasons are not worthy of credence. And while the facts of this case are perhaps unusual, they are hardly novel. In *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424 (1st Cir. 2002), the employer told the employee at the time of his termination that his position was being eliminated and that his termination was not performance-based. *Id.* Later, in response to litigation, the employer switched gears and asserted that the employee's termination was wholly performance-motivated. *Id.* The First Circuit held, precisely as we do today, that while "[a] company may have several legitimate reasons to dismiss an employee," when it "at different times, gives different explanations, a jury may infer that the articulated reasons are pretextual." *Id.* at 432. For other cases involving similar fact patterns and results in our own circuit, see *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1479 (10th Cir. 1996) (plaintiff could show pretext in part because employer gave inconsistent

explanations of criteria used in evaluating plaintiff's performance); *Goldstein v. Sprint United Mgmt. Co.*, 2008 WL 2914967 at \*5 (10th Cir. 2008) ("Because evidence that an employer gave inconsistent reasons justifying its challenged action is an indication of pretext, such a showing would ordinarily be enough to survive summary judgment.") (internal citations and quotation marks omitted); *Hare v. Denver Merchandise Mart, Inc.*, 2007 WL 3230907, at \*7 (10th Cir. 2007) (plaintiff could show pretext "by pointing to an apparent contradiction in the testimony of those involved in the decision to terminate him").

\* \* \*

Ms. Coffelt's failure to disclose her ADEA claim in her initial bankruptcy proceeding bars her from pursuing that claim now, and the district court's grant of summary judgment as to her is affirmed. Because Ms. Paup and Ms. Shuffitt have shouldered their burden of establishing a fact issue about whether Gear Products's legitimate business reasons are pretextual, the district court's grant of summary judgment with respect to them is reversed.

*Affirmed in part and reversed in part.*

ENTERED FOR THE COURT

PER CURIAM

07-5164 - *Paup v. Gear Products, Inc.*

**HARTZ**, Circuit Judge, concurring and dissenting:

I concur in the judgment, except that I think it would be better practice to remand the judicial-estoppel issue for the district court to resolve in the first instance. Granting judgment on the ground of judicial estoppel is a matter of discretion, and the district court is better equipped than we are to devise the most equitable remedy for Ms. Coffelt's misconduct. *See Eastman v. Union Pac. R.R. Co.*, 493 F.3d 1151 (10th Cir. 2007) (affirming district court exercise of discretion in applying judicial estoppel).

I agree with the majority opinion's disposition of the discrimination claims but my analysis is sufficiently different that I write separately.

## I.      BACKGROUND

### A.      The RIFs

GP, a wholly-owned subsidiary of Blount International, Inc., operates a production facility in Tulsa, Oklahoma. In February 2001 Blount informed GP that it needed to reduce operating costs to break even and directed GP to undertake a RIF. On February 14 GP terminated 26 employees, aged 21 to 67. GP's financial struggles continued into the summer, and Blount informed GP that it needed to further reduce its workforce. On October 2, GP terminated eight more employees, this time aged 34 to 66. During both RIFs, GP told department managers that a specified number of positions needed to be cut and asked the managers to determine who would be let go.

GP initially thought that the October 2 RIF would be the last, but later that month Blount instructed GP to terminate three more employees. GP's new President, Tom Brenton, held a meeting to plan the termination process. It was decided that GP could best absorb the loss of administrative employees and therefore limited the pool to be considered to eight employees whose duties were predominately administrative or clerical. The pool included Shuffitt, Coffelt, and Paup.

Shuffitt had been hired by GP in 1976 as an executive secretary to the president and remained in that position throughout her time with GP (although in 2000 her title changed to executive administrative assistant). Coffelt was hired in 1988; her duties were primarily administrative and clerical but she also did some drafting. During her final two years with GP, she worked as a document administrator and her duties were primarily administrative. Paup was hired in 1988 as a production-control clerk in the manufacturing department, and later moved into a buyer/planner position in that department. During the February 2001 RIF, GP informed Paup that her position was being eliminated; she then accepted the offer of a purchasing-coordinator position, which was predominantly clerical.

A six-member management team met to decide who would be terminated. Chairing the team was Brenton, who had been hired from another company to take over as GP President three or four months earlier. The other team members

were Human Resources Director Robin Bond, Vice-President of Engineering Steve Copeland, Quality Manager Dick Gregory, Sales and Marketing Vice-President Jeffrey Schmale, and Controller Tim Simmons, who had been in charge of Tulsa operations for a few months after the February RIF until Brenton's arrival in June or July. The team was provided with a sheet (apparently prepared by the Human Resources Department) with columns for each of the eight employees being considered. Under each employee's name were rows with entries on date of hire, education, additional experience and training, and other skills.

Simmons, who was designated by GP under Fed. R. Civ. P. 30(b)(6) as the person to testify on its behalf about the terminations, described the terminations in his deposition. He said that the management team decided to rank the eight employees in the pool and terminate the three with the lowest scores. Each team member assigned each employee in the pool a score ranging from one to five (five being the highest) in the following categories: (1) flexibility, (2) sense of urgency, (3) initiative, (4) self-starter, (5) multitasking abilities, (6) accuracy, and (7) attitude. The team did not discuss the meanings of the seven categories or how to go about assigning points in a category, and Simmons acknowledged that the ratings were subjective in that they were "not quantifiable by someone else." Aplt. App. Vol. I at 89. Moreover, the record contains no explanation of how each of the six team members had sufficient information to rate each of the eight

-3-

employees.  Human Resources Director Bond would have had some information on every employee but President Brenton had worked for GP only three or four months, and the other members of the team headed different departments for which the eight employees may or may not have worked.  Nor had employee performance been a matter of discussion among GP managers.  Simmons testified that he had heard that in 1998 Shuffitt had been written up for visiting too much, but he had heard no other criticism of any of the Plaintiffs.  He explained that managers "don't make a habit of criticizing or critiquing employees openly." Aplt. App. Vol. II at 336.

Brenton and Bond compiled the scores after the others had left the room. The compiled scores were as follows:

| NAME | AVERAGE SCORE | AGE |
| --- | --- | --- |
| Sally Farmer | 28 Points | 50 |
| Alissa Tanner | 19.5 Points | 33 |
| Brian Callendar | 19 Points | 36 |
| Bill Vickers | 19 Points | 50 |
| Gwen Coffelt | 18.5 Points | 63 |
| Tharon Paup | 15 Points | 58 |
| Peggy West | 15 Points | 57 |
| Carol Shuffitt | 10 Points | 59 |

Brenton and Bond then called the others back to announce that Paup, Coffelt, and Shuffitt would be terminated.  They did not disclose to the others the scores or why they had departed from the rankings to keep West.  Nor was there any further discussion of each employee's skills as they related to GP's needs.

At the time of Plaintiffs' terminations, GP had a layoff policy that provided seniority rights. Simmons at first testified that he did not know whether anyone had "utilized" the policy during the 2001 layoffs, *id.* Vol. I at 88, and that the document had not been produced to him during the October layoff. (The record does not indicate whether anyone whom Simmons supervised was laid off during one of the RIFs. But the list of GP employees terminated in 2001 includes only two who may have been laid off while working under him as controller, and both had less than a year's seniority.) Shortly thereafter, however, Simmons added that "[t]he HR manager was part of that process, and certainly was aware of the policy; and would have been responsible for ensuring we comply." *Id.* He stated that he believed that the policy had been followed in the October 2001 RIF, and to illustrate compliance he pointed out that after Paup's position had been eliminated in the February RIF, she was permitted to take a different position. (Her supervisor at the time, Brian Shrum, testified that he had laid off Paup because he was told that he had to lose one of his three people and Paup was the least senior and least experienced.) In any event, Simmons admitted that seniority was not considered by the management team in terminating Plaintiffs.

On October 26, 2001, Coffelt and Shuffitt were terminated, and Paup was placed on layoff status (but never reinstated). When Coffelt asked Human Resources Director Bond whether she had been terminated because of her age, Bond replied, "[Y]ou know, I can't answer that." *Id.* Vol. II at 296. Also, as

Coffelt was leaving the building, Copeland helped her carry her belongings to her car and said, "[S]omebody needs to get a good lawyer." *Id.* at 297.

## B.     State Administrative Proceedings

Plaintiffs filed charges of discrimination with the Oklahoma Human Rights Commission (OHRC), claiming that they had been discriminated against because of their age. Each plaintiff alleged that she had been replaced, or her duties assumed, by a younger employee who was not more qualified.

In response to the charges, GP asserted that the decision to terminate Plaintiffs resulted from the plummeting economy and was made after objectively considering each employee's individual performance and the skills of the employees relative to each other. GP said that it had considered moving Paup back to the planning position that she had previously occupied so that she would avoid the layoff. But because she had refused that move during the first October RIF less than a month earlier, it decided to lay Paup off and transfer some of her duties to Bill Vickers (50 years old), who was "better qualified, more experienced and ranked higher in the factors utilized by the Committee to establish the best performers in the departments . . . ." *Id.* Vol. I at 209. GP explained that it had terminated Shuffitt because she scored a full five points lower than any other ranked employee. Even so, GP had considered moving her to the sales-secretary position (but determined that she lacked the skills necessary for the position) and to the switchboard position (but she had indicated an "intense dislike" for the

position, *id*. at 217, and "resented being asked to do anything she perceived as 'beneath' or 'not part of' an Executive Administration position," *id.* at 218). GP decided to fill the switchboard position with Peggy West (57 years old), who excelled in the position and had "shown a willingness in the past to take on more duties." *Id.* at 217. As for Coffelt, GP asserted that her position was predominantly administrative and "could be eliminated with virtually no impact on [its] business." *Id.* at 200. Although it conceded that some of her duties were transferred to Sally Farmer (age 50), it noted that Farmer had scored highest on the management team's rankings. Coffelt had asked to be retained in a CAD Designer position (apparently a drafting job), but GP determined that she would be unable to perform all the functions without extensive training. GP asserted that it had never considered Plaintiffs' ages in making its determinations.

In December 2004 and January 2005 the OHRC found that all three Plaintiffs were terminated on the basis of age. Plaintiffs filed this claim in district court on April 20, 2005.

## II.    ANALYSIS OF ADEA CLAIMS

Paup and Shuffitt contend that GP discriminated against them by terminating them on the basis of age. Under the ADEA it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). "When a plaintiff alleges disparate treatment, liability depends on whether the protected

trait (under the ADEA, age) actually motivated the employer's decision." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (internal quotation marks omitted). "That is, the plaintiff's age must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Id.* (brackets and internal quotation marks omitted). Where, as here, a plaintiff lacks direct evidence of discriminatory intent, she may carry her burden "by presenting *circumstantial* evidence in accord with the familiar *McDonnell Douglas* burden-shifting framework." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under *McDonnell Douglas* the plaintiff must first establish a prima facie case of age discrimination. If she satisfies her burden, the employer must then proffer a legitimate, nondiscriminatory reason for the discharge. If it does so, "the burden shifts back to the plaintiff to show that employer's proffered justification is pretextual." *Hinds*, 523 F.3d at 1195.

### A.    Prima Facie Case

"To make out a prima facie case of age discrimination, . . . a plaintiff affected by a RIF [must] show that . . . she (i) was within a protected age group, (ii) was doing satisfactory work, (iii) was discharged despite the adequacy of . . . her work, and (iv) has *some* evidence the employer intended to discriminate against . . . her in reaching its RIF decision." *Id.*; *see also Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998). Plaintiffs may satisfy this

fourth element "through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the RIF." *Beaird*, 145 F.3d at 1165 (brackets and internal quotation marks omitted). Only the second and fourth elements are at issue in this case; it is undisputed that Plaintiffs fall within the protected age group and were discharged.

The second element (performing satisfactory work) is disputed only with respect to Shuffitt. To make a threshold showing, Shuffitt need only provide "some evidence of good performance." *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1420 (10th Cir. 1991). As the district court noted, "There is evidence that Shuffitt was employed for at least fifteen years in the 'top' clerical position in the company, had survived two previous RIFs, and was considered (but rejected) for a move to a different position during the late October 2001 RIF." Op. & Order at 8. GP contends that this evidence is negated by her ranking by the management team—the lowest of all eight employees by a full five points—and the multiple instances in which she had been counseled about tardy work product, gossiping with coworkers, and unacceptable time spent away from her desk. But as the district court correctly explained, "this goes to the 'weight of the evidence of satisfactory performance' and not to Shuffitt's 'initial burden to produce such evidence.'" *Id.* at 8–9 (quoting *Denison*, 941 F.2d at 1420). Accordingly, Shuffitt satisfied the second element of her prima facie case.

On the fourth element (evidence of intent to discriminate), GP contends that neither Paup nor Shuffitt presented such evidence. It argues that each GP employee was subject to the same review process and rating system. But, as this court stated in *Hinds*, "[i]t is the fact that the employer scrutinized *both* [the younger and older employees] during the RIF and decided to retain similarly situated younger employees while discharging an older employee that gives rise to an inference of discrimination." 523 F.3d at 1196*; see also Beaird*, 145 F.3d at 1167 ("[A] plaintiff who is fired pursuant to a RIF and who held a similar position to a younger retained employee can satisfy the fourth element."). GP decided to evaluate eight employees with similar duties (administrative/clerical) and terminated Paup, Shuffitt, and Coffelt. Of the five retained employees, none was older than Plaintiffs—four were younger and the fifth was about the same age as the youngest terminated employee (Paup was 58 and West was one month shy of 58).

GP argues that under *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996), the age difference between Paup and Bill Vickers (who allegedly assumed Paup's duties) was insufficient to establish intent because it was insignificant (Paup was 58 and Vickers 50). Although in *O'Connor* the Supreme Court stated that "an inference [of discrimination] cannot be drawn from the replacement of one worker with another worker insignificantly younger," *id.* at 313, it did not expand on what constitutes *significant*. In *Whittington v. Nordham*

*Group Inc.*, 429 F.3d 986, 995 (10th Cir. 2005), the court rejected the contention that a five-year difference was insignificant as a matter of law. It suffices that Paup alleged that she had been "treated less favorably than [an employee eight years her junior] during the RIF." *Beaird*, 145 F.3d at 1165 (brackets and internal quotation marks omitted).

I am also unpersuaded by GP's argument that its nondiscriminatory motive is established conclusively by its rejected offer to Paup of a different position during the early-October RIF. The offer was not repeated in late October when she would have known that taking the other position was her only way to stay with the company.

GP's final argument against the fourth element of Plaintiffs' prima facie case is that Paup and Coffelt were within the protected class when they were hired (they were 45 and 50 respectively), suggesting that it did not discriminate against them on the basis of age. In support it cites *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359 (7th Cir. 2001). In that case a 54-year-old plaintiff "was hired specifically to service a large health care client of the defendant." *Id* at 360. A few weeks later, the defendant lost the client. Then the defendant decided to discontinue its health-care practice altogether, and terminated the plaintiff under a RIF only five months after he had been hired. *Id.* Affirming the district court's grant of summary judgment to the defendant, the Seventh Circuit observed that

> it is eminently reasonable to doubt that . . . a worker hired at an age
> well beyond that at which the protections of the age discrimination

-11-

law click in and terminated *within months*, that is, before he is appreciably older, was a victim of age discrimination. A company that didn't want 54-year-olds on its payroll would be unlikely to hire one rather than to hire one and promptly fire him, thus inviting a lawsuit because terminated workers are much more likely to sue than ones who have merely not been hired, because of the greater difficulty of proving damages in the latter case.

*Id.* at 361–62 (citations omitted). This case is readily distinguishable from that of Mr. Kadas; Paup and Coffelt had worked for GP for substantially longer (Paup for nine years, and Coffelt for 13) and had become "appreciably older" by the time they were terminated. Although GP's arguments against the fourth element of the prima facie case have substance and could persuade a jury in its favor on the ultimate issue of discrimination, I agree with the district court that Paup and Shuffitt established that element.

## B. Nondiscriminatory Reasons and Evidence of Pretext

GP advances the following nondiscriminatory explanations for terminating Plaintiffs: GP terminated Plaintiffs as part of an overall RIF that had, up to that point, claimed the jobs of 34 employees. During its final RIF, GP decided that it could best absorb the loss of three employees whose primary duties were administrative or clerical (a pool of eight employees). After ranking the employees and considering the needs of the company and the capabilities of each employee, GP terminated Paup, Shuffitt, and Coffelt. Paup had ranked in the bottom three and had refused to change positions during the first October RIF. Shuffitt had received the lowest score of the group by a full five points, and

occupied only a part-time position. GP considered placing her in another position, but ultimately did not do so because of her lack of familiarity with the programs and her unwillingness to perform certain duties. Although Coffelt did not rank in the bottom three, GP decided to retain Peggy West over Coffelt because West could operate the switchboard (which was not self-executing) and Coffelt's administrative duties could be easily absorbed. Moreover, even though Coffelt had started her GP career as a draftsperson, she would need extensive training before she could contribute in that capacity; therefore, GP did not move her to that position.

In light of this explanation, Plaintiffs could avoid summary judgment only by producing evidence that GP's explanation was pretextual, that is, "unworthy of belief." *Beaird*, 145 F.3d at 1165 (internal quotation marks omitted). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotation marks omitted).

Plaintiffs state that they offered the following evidence of pretext: (1) GP has a history of age discrimination; (2) GP has offered inconsistent reasons for its decisions; (3) GP did not follow its layoff policy; (4) GP did not adhere to the

ranking process agreed upon by its management; (5) statements by managers intimated that Plaintiffs were terminated based on age; and (6) the OHRC determined that GP discriminated against Plaintiffs. Other than to state baldly that Paup and Shuffitt have presented no evidence of pretext, GP's brief in this court offers no response to these arguments. (Although the brief addresses the merits of Coffelt's ADEA claim, it says nothing about her pretext arguments.) Nevertheless, I address each item of evidence in turn. The first lacks merit. The remaining five, however, establish a genuine issue of material fact.

First, Plaintiffs contend that "[GP] had a history of cutting heads by getting rid of the old people." Aplt. Br. at 9. In support of this allegation, they provide only Shuffitt's deposition testimony that after her termination she was told by Joan Dake (who had been office manager in 1993 but was no longer employed at GP) that in 1993 an executive "had been brought [to GP] to eliminate the older, longer tenured people." Aplt. App. Vol. II at 257–58. Shuffitt's testimony fails because it is hearsay and thus inadmissible "in support of, or in opposition to, summary judgment." *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir. 1995).

Plaintiffs' second, third, and fourth arguments for pretext are interrelated and will be discussed together. GP had a written layoff policy, which ordinarily requires consideration of an employee's length of service. *See Christie v.*

*Foremost Ins. Co.*, 785 F.2d 584, 586–87 (7th Cir. 1986) (employer's failure to comply with its own policy allowed jury to infer pretext). It provided:

> In the event of a layoff, company-wide length of service will be considered in determining who will be laid off. However, in the event special skills are required for the smooth operation of the plant or office, the Company will reserve the right to retain employees based on required skill, ability and experience as opposed to length of service. The Company reserves the right to retain the employee whose skills and abilities best meet the requirements of the job. The evaluation of these abilities will rest with Supervision and Management.

Aplt. App. Vol. I at 105. If the RIF decision had been based on "company-wide length of service," all three Plaintiffs would have been retained in the RIF.

To be sure, the policy allowed GP "to retain employees based on required skill, ability and experience as opposed to length of service." *Id*. That provision could justify limiting the second October RIF to administrative and clerical employees, whose positions were deemed less necessary than others to the survival of the Company. But it could not have been the basis for deciding among the eight employees considered by the management team. The criteria on which the team members were to rate the employees were flexibility, sense of urgency, initiative, self-starter, multitasking abilities, accuracy, and attitude. These criteria are hardly a proxy for "*required* skill, ability, and experience." *Id*. (emphasis added). At best they are the icing on the cake that distinguishes a boss's favorite employee from those who are merely capable. The policy also says that "[GP] reserves the right to retain the employees whose skills and

-15-

abilities best meet the requirements of the job." *Id.* Perhaps this language could be construed to mean that GP can always keep its best employees and lay off the others. If so, the layoff policy was essentially an empty promise, providing no advantage to seniority (except in the unusual situation of equal ability). A more reasonable construction of the sentence in its context is that it refers to peculiar or special skills or abilities. In any event, GP's brief offers nary a word of explanation of the meaning of the policy. In this circumstance, I would not assume that the policy has the meaning most supportive of summary judgment.

Moreover, the uncontradicted testimony in the record is that seniority was not considered at all in determining whom to lay off. And even if GP had the right to decide simply to retain its best employees, the method utilized was so irregular that pretext could be inferred even if there had been no layoff policy. This court has held that the use of subjective criteria in employment decisions can be evidence of pretext. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217–18 (10th Cir. 2002). That proposition clearly applies here; the method employed in terminating Plaintiffs goes beyond subjectivity to approach utter irrationality. Not only were the seven criteria—flexibility, sense of urgency, initiative, self-starter, multitasking abilities, accuracy, and attitude—matters of subjective judgment; but the management team made no attempt to define any of these criteria so that the members would be rating the same qualities. And, most remarkable of all, there was no reason to believe that anyone on the management

-16-

team, with the possible exception of the Human Resources Director, could be sufficiently informed of each employee's performance to make intelligent assessments. For each of the employees (who were among 128 Tulsa employees at the time), most of the team members were not in that employee's chain of supervision; President Brenton had been with GP only a few months; and those in management had a practice of not "criticizing or critiquing employees openly," Aplt. App. Vol. II at 336 (Simmons testimony), so, for example, Simmons had heard about no criticism of any of the Plaintiffs other than a 1998 write-up of Shuffitt. The likelihood of manipulation is clear. In that circumstance, a plaintiff is not required to produce evidence that a decisionmaker admitted discriminating, *see Garrett*, 305 F.3d at 1217–18, although, as we shall see, two of the decisionmakers came close.

Furthermore, President Brenton, perhaps assisted by Human Resources Director Bond, did not even follow the criteria for the RIF that the management team had agreed upon. The team had decided that the three employees with the lowest scores should be terminated. When Brenton and Bond were supposed to announce the result of their tabulations, however, they stated only that the three Plaintiffs would be discharged. They did not report their tabulations or their departure from the criteria decided upon in discharging Coffelt instead of the lower-scoring West. Their failure to explain their action to the other members of

the management team is most peculiar, and GP's brief makes no attempt to justify the failure.

What GP does do is give its explanations for why Plaintiffs were the ones terminated. I agree that those explanations are plausible. But GP does not explain how those reasons were arrived at through the management-team decisionmaking process. A jury could reasonably doubt the proffered explanations when they have no apparent connection to the criteria used by the management team and they were not provided by Brenton and Bond to the other team members as reasons for their departure from the agreed-upon procedure. I agree with the district court that GP's explanations for the terminations did not change substantially from the EEOC proceedings to the court proceedings; but there is a clear disconnect between their explanations in court and the deposition testimony concerning the decisionmaking process at the time of the RIF.

In this context, substantial weight should be accorded to statements by two members of the management team to Coffelt when she was terminated. Coffelt testified (1) that when she asked Human Resources Director Bond whether she had been terminated because of her age, Bond replied, "[Y]ou know, I can't answer that," Aplt. App. Vol. II at 296, and (2) that when she was leaving the building, Copeland helped carry her belongings to her car and said, "[S]omebody needs to get a good lawyer." *Id.* at 297. GP does not address these allegations in its brief. The second statement is somewhat ambiguous, although a rather strange

-18-

remark for a manager to make to a freshly fired employee. But the first is simply unreal. What reason could the Human Resources Director have for not telling an employee that her firing was unrelated to age, particularly when, as here, the Director had full knowledge of the firing decision? The jury could readily infer that Bond was explaining that her loyalty to GP (or fear of losing her job) prevented her from telling the truth. *See Hicks v. Brown Group, Inc.*, 902 F.2d 630, 650 (8th Cir. 1996), *vacated and remanded on other grounds*, 499 U.S. 914 (1991). To be sure, these statements were made only to Coffelt, not to the other Plaintiffs. But when an employer is shown to have discriminated against a discharged employee on the basis of age, a jury is not required to disregard that evidence when evaluating whether it was just coincidental that the other two employees discharged at the same time were the oldest of the remaining employees under consideration. Once the jury finds that an employer acted with discriminatory animus with respect to one employee in a RIF, it can reasonably extrapolate to a finding that the same animus infected the decision to lay off the other two employees most likely to be subject to that animus. *Schulz v. Hickok Mfg. Co., Inc,*. 358 F. Supp. 1208, 1212 (N.D. Ga. 1973) ("While it is true that the only question in this action is whether defendant discriminated on the basis of age in its discharge of one particular employee, plaintiff Schulz, evidence of the defendant's behavior in similar cases is decidedly relevant to the court's determination of the reasons behind plaintiff's discharge."); *see also Bingman v.*

*Natkin & Co.*, 937 F.2d 553, 557 (10th Cir. 1991) (in ADEA case, evidence of termination of 60-year-old employee one year after plaintiff's termination was relevant to intent).

Plaintiffs' final item of evidence is the OHRC's finding of discrimination. Such a finding may be admissible under Fed. R. Evid. 803(8). *See Chandler v. Roudebush*, 425 U.S. 840, 864 n.39 (1976) ("Prior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal-sector trial de novo."). The district court did not exclude that finding as inadmissible evidence; it merely disagreed with the finding. Such weighing of evidence is impermissible in ruling on a summary-judgment motion. *See Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.*, 358 F.3d 736, 742–743 (10th Cir. 2004). The OHRC decision adds to the weight of evidence against GP.

In sum, on the record before this court a jury could reasonably infer that GP's proffered reasons for discharging Plaintiffs had such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," *Morgan*, 108 F.3d at 1323, that they were unworthy of belief. Summary judgment was therefore improper.