HARTZ, Circuit Judge,
concurring and dissenting:
I concur in the judgment, except that I think it would be better practice to remand the judicial-estoppel issue for the district court to resolve in the first instance. Granting judgment on the ground of judicial estoppel is a matter of discretion, and the district court is better equipped than we are to devise the most equitable remedy for Ms. Coffelt’s misconduct. See Eastman v. Union Pac. R.R. Co., 493 F.3d 1151 (10th Cir.2007) (affirming district court exercise of discretion in applying judicial estoppel).
I agree with the majority opinion’s disposition of the discrimination claims but my analysis is sufficiently different that I write separately.
*115 I. BACKGROUND
A. The RIFs
GP, a wholly-owned subsidiary of Blount International, Inc., operates a production facility in Tulsa, Oklahoma. In February 2001 Blount informed GP that it needed to reduce operating costs to break even and directed GP to undertake a RIF. On February 14 GP terminated 26 employees, aged 21 to 67. GP’s financial struggles continued into the summer, and Blount informed GP that it needed to further reduce its workforce. On October 2, GP terminated eight more employees, this time aged 34 to 66. During both RIFs, GP told department managers that a specified number of positions needed to be cut and asked the managers to determine who would be let go.
GP initially thought that the October 2 RIF would be the last, but later that month Blount instructed GP to terminate three more employees. GP’s new President, Tom Brenton, held a meeting to plan the termination process. It was decided that GP could best absorb the loss of administrative employees and therefore limited the pool to be considered to eight employees whose duties were predominately administrative or clerical. The pool included Shuffitt, Coffelt, and Paup.
Shuffitt had been hired by GP in 1976 as an executive secretary to the president and remained in that position throughout her time with GP (although in 2000 her title changed to executive administrative assistant). Coffelt was hired in 1988; her duties were primarily administrative and clerical but she also did some drafting. During her final two years with GP, she worked as a document administrator and her duties were primarily administrative. Paup was hired in 1988 as a production-control clerk in the manufacturing department, and later moved into a buyer/planner position in that department. During the February 2001 RIF, GP informed Paup that her position was being eliminated; she then accepted the offer of a purchasing-coordinator position, which was predominantly clerical.
A six-member management team met to decide who would be terminated. Chairing the team was Brenton, who had been hired from another company to take over as GP President three or four months earlier. The other team members were Human Resources Director Robin Bond, Vice-President of Engineering Steve Copeland, Quality Manager Dick Gregory, Sales and Marketing Vice-President Jeffrey Schmale, and Controller Tim Simmons, who had been in charge of Tulsa operations for a few months after the February RIF until Brenton’s arrival in June or July. The team was provided with a sheet (apparently prepared by the Human Resources Department) with columns for each of the eight employees being considered. Under each employee’s name were rows with entries on date of hire, education, additional experience and training, and other skills.
Simmons, who was designated by GP under Fed.R.Civ.P. 30(b)(6) as the person to testify on its behalf about the terminations, described the terminations in his deposition. He said that the management team decided to rank the eight employees in the pool and terminate the three with the lowest scores. Each team member assigned each employee in the pool a score ranging from one to five (five being the highest) in the following categories: (1) flexibility, (2) sense of urgency, (3) initiative, (4) self-starter, (5) multitasking abilities, (6) accuracy, and (7) attitude. The team did not discuss the meanings of the seven categories or how to go about assigning points in a category, and Simmons acknowledged that the ratings were sub *116 jective in that they were “not quantifiable by someone else.” Aplt.App. Vol. I at 89. Moreover, the record contains no explanation of how each of the six team members had sufficient information to rate each of the eight employees. Human Resources Director Bond would have had some information on every employee but President Brenton had worked for GP only three or four months, and the other members of the team headed different departments for which the eight employees may or may not have worked. Nor had employee performance been a matter of discussion among GP managers. Simmons testified that he had heard that in 1998 Shuffitt had been written up for visiting too much, but he had heard no other criticism of any of the Plaintiffs. He explained that managers “don’t make a habit of criticizing or critiquing employees openly.” ApltApp. Vol. II at 336.
Brenton and Bond compiled the scores after the others had left the room. The
compiled scores were as follows:
[[Image here]]
Brenton and Bond then called the others back to announce that Paup, Coffelt, and Shuffitt would be terminated. They did not disclose to the others the scores or why they had departed from the rankings to keep West. Nor was there any further discussion of each employee’s skills as they related to GP’s needs.
At the time of Plaintiffs’ terminations, GP had a layoff policy that provided seniority rights. Simmons at first testified that he did not know whether anyone had “utilized” the policy during the 2001 layoffs, id. Vol. I at 88, and that the document had not been produced to him during the October layoff. (The record does not indicate whether anyone whom Simmons supervised was laid off during one of the RIFs. But the list of GP employees terminated in 2001 includes only two who may have been laid off while working under him as controller, and both had less than a year’s seniority.) Shortly thereafter, however, Simmons added that “[t]he HR manager was part of that process, and certainly was aware of the policy; and would have been responsible for ensuring we comply.” Id. He stated that he believed that the policy had been followed in the October 2001 RIF, and to illustrate compliance he pointed out that after Paup’s position had been eliminated in the February RIF, she was permitted to take a different position. (Her supervisor at the time, Brian Shrum, testified that he had laid off Paup because he was told that he had to lose one of his three people and Paup was the least senior and least experienced.) In any event, Simmons admitted that seniority was not considered by the management team in terminating Plaintiffs.
On October 26, 2001, Coffelt and Shuffitt were terminated, and Paup was placed on layoff status (but never reinstated). When Coffelt asked Human Resources Director Bond whether she had been terminated because of her age, Bond replied, “[Y]ou know, I can’t answer that.” Id. Vol. II at 296. Also, as Coffelt was leaving the building, Copeland helped her carry her belongings to her car and said, “[S]ome-body needs to get a good lawyer.” Id. at 297.
B. State Administrative Proceedings
Plaintiffs filed charges of discrimination with the Oklahoma Human Rights Commission (OHRC), claiming that they had been discriminated against because of *117 their age. Each plaintiff alleged that she had been replaced, or her duties assumed, by a younger employee who was not more qualified.
In response to the charges, GP asserted that the decision to terminate Plaintiffs resulted from the plummeting economy and was made after objectively considering each employee’s individual performance and the skills of the employees relative to each other. GP said that it had considered moving Paup back to the planning position that she had previously occupied so that she would avoid the layoff. But because she had refused that move during the first October RIF less than a month earlier, it decided to lay Paup off and transfer some of her duties to Bill Vickers (50 years old), who was “better qualified, more experienced and ranked higher in the factors utilized by the Committee to establish the best performers in the departments.... ” Id. Vol. I at 209. GP explained that it had terminated Shuffitt because she scored a full five points lower than any other ranked employee. Even so, GP had considered moving her to the sales-secretary position (but determined that she lacked the skills necessary for the position) and to the switchboard position (but she had indicated an “intense dislike” for the position, id. at 217, and “resented being asked to do anything she perceived as ‘beneath’ or ‘not part of an Executive Administration position,” id. at 218). GP decided to fill the switchboard position with Peggy West (57 years old), who excelled in the position and had “shown a willingness in the past to take on more duties.” Id. at 217. As for Coffelt, GP asserted that her position was predominantly administrative and “could be eliminated with virtually no impact on [its] business.” Id. at 200. Although it conceded that some of her duties were transferred to Sally Farmer (age 50), it noted that Farmer had scored highest on the management team’s rankings. Coffelt had asked to be retained in a CAD Designer position (apparently a drafting job), but GP determined that she would be unable to perform all the functions without extensive training. GP asserted that it had never considered Plaintiffs’ ages in making its determinations.
In December 2004 and January 2005 the OHRC found that all three Plaintiffs were terminated on the basis of age. Plaintiffs filed this claim in district court on April 20, 2005.
II. ANALYSIS OF ADEA CLAIMS
Paup and Shuffitt contend that GP discriminated against them by terminating them on the basis of age. Under the ADEA it is “unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual ... because of such individual’s age.” 29 U.S.C. § 628(a)(1). “When a plaintiff alleges disparate treatment, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer’s decision.” Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotation marks omitted). “That is, the plaintiff’s age must have actually played a role in the employer’s decision-making process and had a determinative influence on the outcome.” Id. (brackets and internal quotation marks omitted). Where, as here, a plaintiff lacks direct evidence of discriminatory intent, she may carry her burden “by presenting circumstantial evidence in accord with the familiar McDonnell Douglas burden-shifting framework.” Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1195 (10th Cir. 2008); see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under McDonnell Douglas the plaintiff must first establish a prima facie case of age discrimination. If *118 she satisfies her burden, the employer must then proffer a legitimate, nondiscriminatory reason for the discharge. If it does so, “the burden shifts back to the plaintiff to show that employer’s proffered justification is pretextual.” Hinds, 523 F.3d at 1195.
A. Prima Facie Case
“To make out a prima facie case of age discrimination, ... a plaintiff affected by a RIF [must] show that ... she (i) was within a protected age group, (ii) was doing satisfactory work, (iii) was discharged despite the adequacy of. her work, and (iv) has some evidence the employer intended to discriminate against ... her in reaching its RIF decision.” Id.; see also Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1165 (10th Cir.1998). Plaintiffs may satisfy this fourth element “through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the RIF.” Beaird, 145 F.3d at 1165 (brackets and internal quotation marks omitted). Only the second and fourth elements are at issue in this case; it is undisputed that Plaintiffs fall within the protected age group and were discharged.
The second element (performing satisfactory work) is disputed only with respect to Shuffitt. To make a threshold showing, Shuffitt need only provide “some evidence of good performance.” Denison v. Swaco Geolograph Co., 941 F.2d 1416, 1420 (10th Cir.1991). As the district court noted, “There is evidence that Shuffitt was employed for at least fifteen years in the ‘top’ clerical position in the company, had survived two previous RIFs, and was considered (but rejected) for a move to a different position during the late October 2001 RIF.” Op. & Order at 8. GP contends that this evidence is negated by her ranking by the management team — the lowest of all eight employees by a full five points — and the multiple instances in which she had been counseled about tardy work product, gossiping with coworkers, and unacceptable time spent away from her desk. But as the district court correctly explained, “this goes to the ‘weight of the evidence of satisfactory performance’ and not to Shuf-fitt’s ‘initial burden to produce such evidence.’ ” Id. at 8-9 (quoting Denison, 941 F.2d at 1420). Accordingly, Shuffitt satisfied the second element of her prima facie case.
On the fourth element (evidence of intent to discriminate), GP contends that neither Paup nor Shuffitt presented such evidence. It argues that each GP employee was subject to the same review process and rating system. But, as this court stated in Hinds, “[i]t is the fact that the employer scrutinized both [the younger and older employees] during the RIF and decided to retain similarly situated younger employees while discharging an older employee that gives rise to an inference of discrimination.” 523 F.3d at 1196; see also Beaird, 145 F.3d at 1167 (“[A] plaintiff who is fired pursuant to a RIF and who held a similar position to a younger retained employee can satisfy the fourth element.”). GP decided to evaluate eight employees with similar duties (administrative/clerical) and terminated Paup, Shuf-fitt, and Coffelt. Of the five retained employees, none was older than Plaintiffs— four were younger and the fifth was about the same age as the youngest terminated employee (Paup was 58 and West was one month shy of 58).
GP argues that under O’Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), the age difference between Paup and Bill Vickers (who allegedly assumed Paup’s duties) was insufficient to establish intent because it was insignificant (Paup was 58 and Vickers 50). Although in *119 O’Connor the Supreme Court stated that “an inference [of discrimination] cannot be drawn from the replacement of one worker with another worker insignificantly younger,” id. at 313, 116 S.Ct. 1307, it did not expand on what constitutes significant. In Whittington v. Nordam Group Inc., 429 F.3d 986, 995 (10th Cir.2005), the court rejected the contention that a five-year difference was insignificant as a matter of law. It suffices that Paup alleged that she had been “treated less favorably than [an employee eight years her junior] during the RIF.” Beaird, 145 F.3d at 1165 (brackets and internal quotation marks omitted).
I am also unpersuaded by GP’s argument that its nondiscriminatory motive is established conclusively by its rejected offer to Paup of a different position during the early-October RIF. The offer was not repeated in late October when she would have known that taking the other position was her only way to stay with the company.
GP’s final argument against the fourth element of Plaintiffs’ prima facie case is that Paup and Coffelt were within the protected class when they were hired (they were 45 and 50 respectively), suggesting that it did not discriminate against them on the basis of age. In support it cites Kadas v. MCI Systemhouse Corp., 255 F.3d 359 (7th Cir.2001). In that case a 54-year-old plaintiff “was hired specifically to service a large health care client of the defendant.” Id. at 360. A few weeks later, the defendant lost the client. Then the defendant decided to discontinue its health-care practice altogether, and terminated the plaintiff under a RIF only five months after he had been hired. Id. Affirming the district court’s grant of summary judgment to the defendant, the Seventh Circuit observed that
it is eminently reasonable to doubt that ... a worker hired at an age well beyond that at which the protections of the age discrimination law click in and terminated within months, that is, before he is appreciably older, was a victim of age discrimination. A company that didn’t want 54-year-olds on its payroll would be unlikely to hire one rather than to hire one and promptly fire him, thus inviting a lawsuit because terminated workers are much more likely to sue than ones who have merely not been hired, because of the greater difficulty of proving damages in the latter case.
Id. at 361-62 (citations omitted). This case is readily distinguishable from that of Mr. Kadas; Paup and Coffelt had worked for GP for substantially longer (Paup for nine years, and Coffelt for 13) and had become “appreciably older” by the time they were terminated. Although GP’s arguments against the fourth element of the prima facie case have substance and could persuade a jury in its favor on the ultimate issue of discrimination, I agree with the district court that Paup and Shuffitt established that element.
B. Nondiscriminatory Reasons and Evidence of Pretext
GP advances the following nondiscriminatory explanations for terminating Plaintiffs: GP terminated Plaintiffs as part of an overall RIF that had, up to that point, claimed the jobs of 34 employees. During its final RIF, GP decided that it could best absorb the loss of three employees whose primary duties were administrative or clerical (a pool of eight employees). After ranking the employees and considering the needs of the company and the capabilities of each employee, GP terminated Paup, Shuffitt, and Coffelt. Paup had ranked in the bottom three and had refused to change positions during the first October RIF. Shuffitt had received the lowest score of the group by a full five points, and occupied only a part-time position. GP *120 considered placing her in another position, but ultimately did not do so because of her lack of familiarity with the programs and her unwillingness to perform certain duties. Although Coffelt did not rank in the bottom three, GP decided to retain Peggy West over Coffelt because West could operate the switchboard (which was not self-executing) and Coffelt’s administrative duties could be easily absorbed. Moreover, even though Coffelt had started her GP career as a draftsperson, she would need extensive training before she could contribute in that capacity; therefore, GP did not move her to that position.
In light of this explanation, Plaintiffs could avoid summary judgment only by producing evidence that GP’s explanation was pretextual, that is, “unworthy of belief.” Beaird, 145 F.3d at 1165 (internal quotation marks omitted). “Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer’s proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons.” Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir.1997) (internal quotation marks omitted).
Plaintiffs state that they offered the following evidence of pretext: (1) GP has a history of age discrimination; (2) GP has offered inconsistent reasons for its decisions; (3) GP did not follow its layoff policy; (4) GP did not adhere to the ranking process agreed upon by its management; (5) statements by managers intimated that Plaintiffs were terminated based on age; and (6) the OHRC determined that GP discriminated against Plaintiffs. Other than to state baldly that Paup and Shuffitt have presented no evidence of pretext, GP’s brief in this court offers no response to these arguments. (Although the brief addresses the merits of Coffelt’s ADEA claim, it says nothing about her pretext arguments.) Nevertheless, I address each item of evidence in turn. The first lacks merit. The remaining five, however, establish a genuine issue of material fact.
First, Plaintiffs contend that “[GP] had a history of cutting heads by getting rid of the old people.” Aplt. Br. at 9. In support of this allegation, they provide only Shuf-fitt’s deposition testimony that after her termination she was told by Joan Dake (who had been office manager in 1993 but was no longer employed at GP) that in 1993 an executive “had been brought [to GP] to eliminate the older, longer tenured people.” Aplt.App. Vol. II at 257-58. Shuffitt’s testimony fails because it is hearsay and thus inadmissible “in support of, or in opposition to, summary judgment.” Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir.1995).
Plaintiffs’ second, third, and fourth arguments for pretext are interrelated and will be discussed together. GP had a written layoff policy, which ordinarily requires consideration of an employee’s length of service. See Christie v. Foremost Ins. Co., 785 F.2d 584, 586-87 (7th Cir.1986) (employer’s failure to comply with its own policy allowed jury to infer pretext). It provided:
In the event of a layoff, company-wide length of service will be considered in determining who will be laid off. However, in the event special skills are required for the smooth operation of the plant or office, the Company will reserve the right to retain employees based on required skill, ability and experience as opposed to length of service. The Company reserves the right to retain the employee whose skills and abilities best meet the requirements of the job. The *121 evaluation of these abilities will rest with Supervision and Management.
ApltApp. Vol. I at 105. If the RIF decision had been based on “company-wide length of service,” all three Plaintiffs would have been retained in the RIF.
To be sure, the policy allowed GP “to retain employees based on required skill, ability and experience as opposed to length of service.” Id. That provision could justify limiting the second October RIF to administrative and clerical employees, whose positions were deemed less necessary than others to the survival of the Company. But it could not have been the basis for deciding among the eight employees considered by the management team. The criteria on which the team members were to rate the employees were flexibility, sense of urgency, initiative, self-starter, multitasking abilities, accuracy, and attitude. These criteria are hardly a proxy for “required skill, ability, and experience.” Id. (emphasis added). At best they are the icing on the cake that distinguishes a boss’s favorite employee from those who are merely capable. The policy also says that “[GP] reserves the right to retain the employees whose skills and abilities best meet the requirements of the job.” Id. Perhaps this language could be construed to mean that GP can always keep its best employees and lay off the others. If so, the layoff policy was essentially an empty promise, providing no advantage to seniority (except in the unusual situation of equal ability). A more reasonable construction of the sentence in its context is that it refers to peculiar or special skills or abilities. In any event, GP’s brief offers nary a word of explanation of the meaning of the policy. In this circumstance, I would not assume that the policy has the meaning most supportive of summary judgment.
Moreover, the uncontradicted testimony in the record is that seniority was not considered at all in determining whom to lay off. And even if GP had the right to decide simply to retain its best employees, the method utilized was so irregular that pretext could be inferred even if there had been no layoff policy. This court has held that the use of subjective criteria in employment decisions can be evidence of pretext. See Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1217-18 (10th Cir.2002). That proposition clearly applies here; the method employed in terminating Plaintiffs goes beyond subjectivity to approach utter irrationality. Not only were the seven criteria — flexibility, sense of urgency, initiative, self-starter, multitasking abilities, accuracy, and attitude — matters of subjective judgment; but the management team made no attempt to define any of these criteria so that the members would be rating the same qualities. And, most remarkable of all, there was no reason to believe that anyone on the management team, with the possible exception of the Human Resources Director, could be sufficiently informed of each employee’s performance to make intelligent assessments. For each of the employees (who were among 128 Tulsa employees at the time), most of the team members were not in that employee’s chain of supervision; President Brenton had been with GP only a few months; and those in management had a practice of not “criticizing or critiquing employees openly,” Aplt.App. Vol. II at 336 (Simmons testimony), so, for example, Simmons had heard about no criticism of any of the Plaintiffs other than a 1998 write-up of Shuffitt. The likelihood of manipulation is clear. In that circumstance, a plaintiff is not required to produce evidence that a decisionmaker admitted discriminating, see Garrett, 305 F.3d at 1217-18, although, as we shall see, two of the decisionmakers came close.
*122 Furthermore, President Brenton, perhaps assisted by Human Resources Director Bond, did not even follow the criteria for the RIF that the management team had agreed upon. The team had decided that the three employees with the lowest scores should be terminated. When Brenton and Bond were supposed to announce the result of their tabulations, however, they stated only that the three Plaintiffs would be discharged. They did not report their tabulations or their departure from the criteria decided upon in discharging Coffelt instead of the lower-scoring West. Their failure to explain their action to the other members of the management team is most peculiar, and GP’s brief makes no attempt to justify the failure.
What GP does do is give its explanations for why Plaintiffs were the ones terminated. I agree that those explanations are plausible. But GP does not explain how those reasons were arrived at through the management-team decisionmaking process. A jury could reasonably doubt the proffered explanations when they have no apparent connection to the criteria used by the management team and they were not provided by Brenton and Bond to the other team members as reasons for their departure from the agreed-upon procedure. I agree with the district court that GP’s explanations for the terminations did not change substantially from the EEOC proceedings to the court proceedings; but there is a clear disconnect between their explanations in court and the deposition testimony concerning the decisionmaking process at the time of the RIF.
In this context, substantial weight should be accorded to statements by two members of the management team to Cof-felt when she was terminated. Coffelt testified (1) that when she asked Human Resources Director Bond whether she had been terminated because of her age, Bond replied, “[Y]ou know, I can’t answer that,” Aplt.App. Vol. II at 296, and (2) that when she was leaving the building, Copeland helped carry her belongings to her car and said, “[SJomebody needs to get a good lawyer.” Id. at 297. GP does not address these allegations in its brief. The second statement is somewhat ambiguous, although a rather strange remark for a manager to make to a freshly fired employee. But the first is simply unreal. What reason could the Human Resources Director have for not telling an employee that her firing was unrelated to age, particularly when, as here, the Director had full knowledge of the firing decision? The jury could readily infer that Bond was explaining that her loyalty to GP (or fear of losing her job) prevented her from telling the truth. See Hicks v. Brown Group, Inc., 902 F.2d 630, 650 (8th Cir.1990), vacated and remanded on other grounds, 499 U.S. 914, 111 S.Ct. 1299, 113 L.Ed.2d 234 (1991). To be sure, these statements were made only to Cof-felt, not to the other Plaintiffs. But when an employer is shown to have discriminated against a discharged employee on the basis of age, a jury is not required to disregard that evidence when evaluating whether it was just coincidental that the other two employees discharged at the same time were the oldest of the remaining employees under consideration. Once the jury finds that an employer acted with discriminatory animus with respect to one employee in a RIF, it can reasonably extrapolate to a finding that the same animus infected the decision to lay off the other two employees most likely to be subject to that animus. Schulz v. Hickok Mfg. Co., Inc., 358 F.Supp. 1208, 1212 (N.D.Ga.1973) (“While it is true that the only question in this action is whether defendant discriminated on the basis of age in its discharge of one particular employee, plaintiff Schulz, evidence of the defendant’s behavior in similar cases is decidedly relevant to *123 the court’s determination of the reasons behind plaintiffs discharge.”); see also Bingman v. Natkin & Co., 937 F.2d 553, 557 (10th Cir.1991) (in ADEA case, evidence of termination of 60-year-old employee one year after plaintiffs termination was relevant to intent).
Plaintiffs’ final item of evidence is the OHRC’s finding of discrimination. Such a finding may be admissible under Fed. R.Evid. 803(8). See Chandler v. Roude-bush, 425 U.S. 840, 864 n. 39, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976) (“Prior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal-sector trial de novo.”). The district court did not exclude that finding as inadmissible evidence; it merely disagreed with the finding. Such weighing of evidence is impermissible in ruling on a summary-judgment motion. See Nat’l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d 736, 742-743 (10th Cir.2004). The OHRC decision adds to the weight of evidence against GP.
In sum, on the record before this court a jury could reasonably infer that GP’s proffered reasons for discharging Plaintiffs had such “weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions,” Morgan, 108 F.3d at 1323, that they were unworthy of belief. Summary judgment was therefore improper.